[Civ. No. 1689. Fourth Appellate District.—December 21, 1937.]

SIDNEY R. GARFIELD, Respondent, v. PEOPLES FINANCE & THRIFT COMPANY OF RIVERSIDE (a Corporation) et al., Appellants.

Best & Best for Appellants.

Edward W. Lloyd for Respondent.

MARKS, J.—This is an appeal from a judgment in favor of plaintiff for damages for alleged malicious prosecution resulting from his arrest under two criminal complaints which were sworn to by J. D. Weatherly, an employee of the Peoples Finance & Thrift Company of Riverside.

The amended complaint contains two causes of action. The first is based on a complaint sworn to before the Justice of the Peace of Mecca Township in Riverside County in which plaintiff was charged with violating the provisions of section 417 of the Penal Code. The second is based on a complaint filed in Riverside township charging plaintiff with assault with a deadly weapon.

The answers of the defendants put in issue all of the material allegations of the amended complaint and plead that they acted on the advice of counsel. The answer of the corporate defendant further puts in issue the authority of J. D. Weatherly, its employee, who swore to the two complaints. This defense seems not to have been stressed during the trial and need not be considered here.

The trial court found in favor of plaintiff on all material issues. It found damages under the first count in the sum of $500, and under the second in the sum of $2,549.49, and rendered judgment accordingly.

We need only consider here the questions of malice on the part of the defendants, probable cause, and the defense of acting on advice of counsel.

The existence of malice on the part of the defendants and the lack of probable cause for filing the complaints must be alleged and proved by plaintiff before a judgment based on malicious prosecution can be sustained. The burden of proving both malice and lack of probable cause is on plaintiff. (*Starkweather* v. *Eddy*, 210 Cal. 483 [292 Pac. 467].) While malice, as a matter of law, is not presumed to exist because of lack of probable cause, it may be inferred as a question of fact where there is lack of probable cause. (16 Cal. Jur. 747, and cases cited.) Lack of probable cause can-

not be inferred from the existence of malice. In *Burke* v. *Watts*, 188 Cal. 118 [204 Pac. 578], it is said:

"In *Runo* v. *Williams*, 162 Cal. 444, 450 [122 Pac. 1082, 1085], it is said: 'The two essential facts which must concur to support an action for malicious prosecution are want of probable cause and malice, and the burden of proving both is upon the plaintiff. Malice in fact is really the foundation of the action and is usually the pivotal point upon which the action turns. It is always a fact directly in issue. Its existence may be inferred by the jury from want of probable cause for the prosecution, or from acts or declarations of the defendant expressing or indicating prejudice, ill will, or malicious motive in the matter of the prosecution. The want of probable cause does not raise a legal presumption of malice; the law presumes nothing on that issue any more than it does on any other issue of fact in a civil action. The jury may, however, if they find that there was no probable cause for the prosecution, infer malice therefrom, although malice is not a necessary inference to be deduced therefrom.' It was held in *Moneyweight Scale Co.* v. *McCormick*, 109 Md. 170 [72 Atl. 537], that 'the malice which is required to be shown is the wrongful motive that prompted the prosecution, and may be established by proof of any motive other than that of bringing a guilty party to justice'."

In *Johnson* v. *Southern Pac. Co.*, 157 Cal. 333 [107 Pac. 611], it is said:

"It was shown that, after the taking of the evidence upon the preliminary examination, the committing magistrate adjudged that the plaintiff was probably guilty of the offense and made the order committing him to answer thereto in the superior court. It is settled law that this is *prima facie* evidence of the existence of probable cause for the prosecution. (*Ganea* v. *Southern Pacific R. R. Co.*, 51 Cal. 140; *Hahn* v. *Schmidt*, 64 Cal. 284, 286 [30 Pac. 818]; *Diemer* v. *Herber*, 75 Cal. 287, 290 [17 Pac. 205]; *Holliday* v. *Holliday*, 123 Cal. 26, 32 [55 Pac. 703].)"

If there is no evidence sufficient to overcome this *prima facie* evidence of probable cause arising from the commitment of Dr. Garfield by the magistrate, plaintiff's case must fail for want of proof of probable cause.

In *Lee* v. *Levison*, 173 Cal. 166 [159 Pac. 438], probable cause is thus defined:

"This court from the earliest history of the state has adopted the definition for 'probable cause' derived from the discussion in Greenleaf's treatise on Evidence: 'Probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.' "

In *Richter* v. *Neilson,* 11 Cal. App. (2d) 503 [54 Pac. (2d) 54], the court said:

"The rule is that where there is no substantial conflict in the evidence the question of what facts and circumstances amount to probable cause is one of law (*Booream* v. *Potter Hotel Co.,* 154 Cal. 99 [97 Pac. 65] ; *Holliday* v. *Holliday,* 123 Cal. 26 [55 Pac. 703] ; *Ball* v. *Rawles,* 93 Cal. 222 [28 Pac. 937, 27 Am. St. Rep. 174] ; *Moore* v. *Durrer,* 127 Cal. App. 759 [16 Pac. (2d) 676] ; *Haydel* v. *Morton,* 8 Cal. App. (2d) 730 [48 Pac. (2d) 709]) ; and that no presumption of malice arises from a want of probable cause. (*Griswold* v. *Griswold,* 143 Cal. 617 [77 Pac. 672].) Moreover, probable cause does not depend on the actual state of the case in point of fact, but upon the honest and reasonable belief of the party prosecuting; and the question of whether there was probable cause must be determined from the facts as they existed and appeared to the party prosecuting at the time he preferred the charge. (*Harkrader* v. *Moore,* 44 Cal. 144; *Griswold* v. *Griswold, supra.*) "

At page 514 of this last cited case it is further said:

"We are also unable to sustain plaintiff's contention that a legal duty was imposed on defendant 'to check up on the actual payments' which had been made by plaintiff before swearing to the complaint, and that her failure so to do was evidence of malice. The rule is that if there are any circumstances within the knowledge of the prosecuting witness, or which he is chargeable with knowing, which would destroy the apparent effect of the facts stated by him, or if, after obtaining the advice of counsel, and before acting upon it, other facts should come to his knowledge, which he did not submit, his good faith in seeking advice or in acting thereon would be impeached, and the defense dependent upon such good faith would fail. But it is not necessary that a prosecuting witness shall institute an investigation of the crime itself, or seek to ascertain whether there are other facts relating to the offense, or to find out whether the accused has

any defense to the charge; nor is he required to exhaust all sources of information bearing upon the facts which have come to his knowledge, and therefore if it is shown that he acts in good faith and fairly discloses to the prosecuting attorney all the facts within his knowledge relating to the offense, and is advised that there is probable cause for an arrest, his defense of probable cause is established and he is exonerated from liability even though the defendant should show at the trial other facts sufficient to secure his acquittal and which might have been ascertained by the prosecuting witness if he had made more diligent inquiry therefor. (*Dunlap* v. *New Zealand F. & M. I. Co.*, 109 Cal. 365 [42 Pac. 29]; *Ball* v. *Rawles, supra; Johnson* v. *Southern Pac. Co.*, 157 Cal. 333 [107 Pac. 611].)''

With these well-settled rules of law before us we must proceed to the consideration of the three questions confronting us, namely, sufficiency of the proof of malice, sufficiency of the proof of lack of probable cause, and sufficiency of the proof that defendants acted in good faith and on the advice of counsel.

There is no direct evidence of the existence of any malice on the part of either defendant. The proof of the existence of malice must depend on the sufficiency of the evidence to establish lack of probable cause for the prosecution, for if plaintiff did not establish lack of probable cause there would be no proof of malice. Under such circumstances there would be no proven fact from which malice could be inferred by the trier of fact. Therefore, we must examine the evidence to determine its sufficiency to support the finding of lack of probable cause for the two prosecutions, not only to determine its sufficiency on that question but also on the question of malice. They must stand or fall together.

Plaintiff is a duly licensed and practicing physician and surgeon who was operating several hospitals for the care of employees of contractors engaged in constructing the aqueduct for the Metropolitan Water District. He was stationed at one of these hospitals near Desert Center in Riverside County. This hospital was known as the Contractors General Hospital. In October, 1933, he needed an ambulance for use at this hospital. Thomas J. Casey was an undertaker with his place of business in Indio. Plaintiff and Casey entered into a parol agreement whereby Casey secured an ambulance for

the use of plaintiff at his Desert Center Hospital. The terms of this agreement are not at all clear and can only be estimated from what was done under it and from a most informal writing executed on October 5, 1934.

Casey purchased the ambulance from a sales agency of the Ford Motor Company. An unpaid balance of its purchase price was financed in the usual way through the Universal Credit Company. Plaintiff was to pay Casey $25 per month for eighteen months. These monthly payments were to be applied on this debt, the balance of each of the monthly instalments was to be paid by Casey, who was to conduct the funerals of those dying at plaintiff's hospital. Painted on the sides of the ambulance were the words "Contractors General Hospital". In October, 1933, the ambulance was placed in plaintiff's possession at his Desert Center Hospital, where it remained until a short time after May 28, 1935, except for a few days in the summer of 1934 when Casey repossessed it. Apparently plaintiff was to pay all expenses of operation and upkeep and was to have the use of the ambulance until the aqueduct should be completed. The Universal Credit Company appeared on the state registration certificates as the legal owner and Thomas J. Casey as the registered owner of the ambulance. These certificates did not disclose any interest of plaintiff in the ambulance as lessee or otherwise.

Early in March, 1935, Casey probably became delinquent in his payments to the Universal Credit Company. On three prior occasions the Peoples Finance & Thrift Company of Riverside had financed the purchase of motor vehicles for Casey. On each of these occasions the loans had been satisfactorily repaid. He went to the office of the corporation in Riverside and through L. A. Weatherly, its manager, negotiated a new loan with the ambulance as security. Weatherly testified that Casey told him that he (Casey) was using the ambulance at the Desert Center Hospital, but told him nothing of any lease to or contract with plaintiff. Casey's testimony on this question is conflicting. At one time he testified he told Weatherly that plaintiff had the ambulance under some agreement; that he (Casey) was in default because plaintiff owed him money and would not pay it. He several times corroborated the testimony of Weatherly.

The loan to Casey was made by the Peoples Finance & Thrift Company of Riverside. Its money was used to pay the purchase price indebtedness of Casey to the Universal Credit Company. Casey and his wife executed a chattel mortgage on the ambulance to the Peoples Finance & Thrift Company of Riverside. It was duly recorded and filed. (Sec. 45¼, California Vehicle Act.) New registration certificates were issued showing the Peoples Finance & Thrift Company of Riverside as the legal owner and Casey as the registered owner. There is evidence that the "white slip" was in the ambulance while it was in plaintiff's possession, and until May 28, 1935. Plaintiff must, therefore, be charged with notice of the condition of the record title of the ambulance as set forth in this certificate. He at no time sought to register his interest under the lease.

Section 16 of the California Vehicle Act in effect at the time here in question defined an owner of a motor vehicle as follows:

"A person having the lawful use or control or the right to the use or control of a vehicle under a lease or otherwise for a period of ten or more successive days."

Section 45 of the same act provides the formalities which must be observed on the transfer or change of ownership of a motor vehicle and requires a change of the registration certificates. These provisions were not followed at the time plaintiff became lawfully entitled to the use and control of the ambulance under his lease which was for a period of more than ten successive days. The last subdivision of section 45 provides as follows:

"(e) Until said division shall have issued said new certificate of registration and certificate of ownership as hereinbefore in subdivision (d) provided, delivery of such vehicle shall be deemed not to have been made and title thereto shall be deemed not to have passed and said intended transfer shall be deemed to be incomplete and not to be valid or effective for any purpose."

We are not here concerned with the actual ownership of the ambulance. The foregoing sections of the California Vehicle Act only become important as they bear upon the good faith of the Peoples Finance & Thrift Company of Riverside in demanding possession of the ambulance and of

plaintiff in resisting that demand and forcibly retaining its possession.

Casey made no payment on his indebtedness to the Peoples Finance & Thrift Company of Riverside though several demands were made upon him. Finally, he told the representatives of that corporation that he could not pay his indebtedness; that the ambulance was at the hospital near Desert Center; that the corporation should repossess and take possession of it.

On May 27, 1935, J. D. Weatherly was sent to the hospital to repossess the ambulance. He went to the hospital, saw plaintiff, and told him he had come for the ambulance. Plaintiff told Weatherly that he was in possession of the ambulance under an agreement with Casey and believed that his possession was legal. He (plaintiff) called his attorney in Los Angeles and was advised to retain possession. This was communicated to both J. D. and L. A. Weatherly. L. A. Weatherly finally advised his brother (J. D.) to return without the ambulance. The meeting was amiable. Several other matters were discussed at that time with which we need not burden this opinion.

On May 27, 1935, the attorney for the Peoples Finance & Thrift Company of Riverside held a telephone conversation with the attorney for plaintiff. Each attorney disclosed to the other the facts upon which his client based the claim of the right of possession of the ambulance. The attorneys reached the conclusion that the controversy should be settled in a civil court action. This was a sensible, as well as a sound legal conclusion which should have been followed, and if the advice of counsel had been followed this action would never have been instituted. There is nothing in the record to indicate that the attorneys for defendants had any advance information of the events that followed.

On May 28, 1935, L. A. Weatherly sent his brother to repossess the ambulance. He took Bill Peterson with him to drive the ambulance to Riverside. Asley Mullins accompanied the two on the trip.

When J. D. Weatherly reached the hospital he told plaintiff that he had come for the ambulance and was going to take it to Riverside. Plaintiff asserted his right of possession and refused to surrender it. Weatherly went to the ambulance, found the ignition locked and the key gone. His car

was backed to the front of the ambulance and Weatherly proceeded to tie the two vehicles together with a rope. Plaintiff went to the place where the two vehicles were parked and attempted to untie the rope. Failing in this he called for a gun. A revolver was brought by Dr. I. S. Cherry, an assistant at the hospital. Plaintiff testified that with the gun hanging at his side, in his hand, he advanced to the rope and attempted to untie it; that he was unsuccessful in doing so because Weatherly held the ends of the knot; that while he held the gun at his side he said to Weatherly, "You better stay away from the ambulance"; that he did not threaten to shoot Weatherly nor did he point the gun at him; that he was "somewhat excited" and "somewhat angry" at the time; that he did not know that the revolver was unloaded; that as he could not untie the rope he called for a knife which was brought by a hospital interne and the tow rope was cut; that Weatherly then drove away with his companions saying, "Let's go get the sheriff". Plaintiff explained his reasons for arming himself as follows:

"Why, I thought the presence—I thought there was going to be a fight, and I thought the presence of a gun would impress them sufficiently so as to keep everything quiet and peaceful."

Dr. Cherry testified that when he procured the revolver he unloaded it. This was not known to plaintiff until a later date.

Weatherly's testimony differs from that of the plaintiff in but three particulars: (1) that plaintiff pointed the revolver at him, and (2) said, "If you touch that ambulance I will shoot you"; (3) that the revolver was loaded as he could see the color of the shells and the bullets in the chamber of the cylinder. He was corroborated by his two companions in all particulars except as to the revolver being loaded. From the position they occupied they could not see into the chambers.

Weatherly went before the justice of the peace of Mecca township and made a complete statement of the above occurrence. The only particulars in which this statement differed from the testimony of plaintiff is (1) that the gun was pointed at Weatherly, and (2) that plaintiff threatened to shoot him if he touched the ambulance. There was nothing said at that time about the revolver being loaded.

Section 417 of the Penal Code provides as follows: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, or any other deadly weapon whatsoever, in a rude, angry or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor."

Subdivision two of section 693 of the Penal Code provides that lawful resistance sufficient to prevent a public offense may be made by the party about to be injured "to prevent an illegal attempt by force to take or injure property in his lawful possession".

When we measure the sufficiency of the proof of probable cause of J. D. Weatherly when he swore to the complaint filed in Mecca township we must accept plaintiff's version of the controversy as true. (*Murray* v. *Kunde,* 91 Cal. App. 440 [267 Pac. 158].) Plaintiff admitted that he was excited and angry; that he exhibited the revolver in the hope that it would dissuade Weatherly from his purpose of taking the ambulance, or, in other and less elegant but expressive words, "bluff" Weatherly. Thus plaintiff admitted that his actions constituted a violation of every necessary element of the crime denounced by section 417 of the Penal Code, unless they were done in lawful defense of his possession of the ambulance, as the pointing of the weapon at the complaining witness is not a necessary element of the offense charged. If he had no paramount lawful right of its possession he was clearly guilty of the offense charged.

As we have before remarked we are not here concerned with a decision of the fine and close legal question as to which party had the actual right of legal possession of the ambulance, for the existence of probable cause must be determined from the facts as they appeared to J. D. Weatherly at the time he filed the complaint. (*Richter* v. *Neilson, supra.*) The actual guilt or innocence of Dr. Garfield is not the controlling factor here for it is only necessary that there was probable cause to have believed him guilty. "Probable cause is a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." (*Lee* v. *Levison, supra.*) Weatherly knew that the ambulance was registered with the Peoples Finance & Thrift Company of Riverside as legal owner and Casey as the registered owner;

that the corporation had a chattel mortgage which gave it the right of immediate possession under the existing default. He also knew from the certificates of registration that plaintiff had failed to attempt to register his leasehold interest and the penalty imposed for such failure. (Secs. 16 and 45, California Vehicle Act.) These facts were sufficient to raise in his mind a reasonable belief that his employer had the legal right to the immediate possession of the ambulance. It follows that there was probable cause for filing the complaint in Mecca township. Probable cause having been proven, malice may not be inferred. The portion of the judgment rendered on the first cause of action must be reversed because the findings of malice and lack of probable cause are not supported by the evidence.

■ The proof offered in support of the second cause of action differs in some respects from that introduced in support of the first. This variance sufficiently appears when we consider the defense of acting on advice of counsel.

On May 29, 1935, J. D. Weatherly interviewed the district attorney of Riverside County and was by him sent to a deputy district attorney for further interrogation. The testimony of these two officials is not contradicted.

It is not necessary to review the testimony of the district attorney as all facts disclosed to that officer were communicated to the deputy. The deputy was acting for his chief and the advice of the deputy should constitute an adequate defense, if established.

The deputy district attorney testified as follows:

"Mr. Weatherly came into my office. Someone brought him in, I don't remember who, and I asked him what his troubles were and he said that the day before he had gone down on the desert to retake possession of a car which was mortgaged to the Peoples Finance & Thrift Company here in Riverside, that he went down to the Contractors Hospital where this ambulance was located and that he told Doctor Garfield that he came to take possession of the ambulance; that he went out to take the ambulance; that there was someone there who attempted to interfere with his taking the ambulance and that he backed up or had his car backed up to the ambulance and tied a rope from the rear of his car on to the front part of the ambulance and Doctor Garfield came out of the hospital, out of the building and that Doctor Garfield told

him not to take the car; that someone there had a gun and that Doctor Garfield got possession of the gun, that he pointed the gun at himself, Mr. Weatherly, and told Mr. Weatherly that if he touched the ambulance that he would shoot him.

"I asked Mr. Weatherly if the gun was loaded and Mr. Weatherly said, 'Yes, the gun was loaded.' I asked him how he could tell it was loaded and he said that he could see the rim of the butt end of the cartridge, that the gun was a revolver and that the brass part of the cartridge could be seen and he saw it and that he saw the bullets, or the bullet end of the cartridge, and I asked him if he was sure he could see those things and he said that he was. I asked him how far the gun was from him and he said within a foot or a foot and a half from his body and was pointing at him and I said, 'Well, if the gun was pointed directly at you how could you see the brass part of the cartridge,' and he said, 'Well, it was not pointed directly at me all the time, part of the time it was sideways,' so he could see that, the butt end of the cartridge, and I asked him who had given him the contract on the automobile and he said that Mr. Casey of Indio had given him a contract and that it was an ambulance instead of an automobile, and I asked him how it happened the ambulance was down at the hospital and he told me that Mr. Casey had lent the automobile or rented the automobile on some sort of deal to the doctor and I asked him if he threatened Mr. Garfield in any manner himself and he said no, that he did not and he told me that the rope that was attached on to the ambulance was cut with a knife and I asked him if anybody attempted to assault him with a knife and he said no, there was no motion made toward him with the knife or any threat made with the knife. I asked him what kind of revolver it was and as I recall he told me he thought it was a 38.

"We talked there about half an hour, I imagine. I asked him if he had the pink certificate on the automobile and as I recall he told me that the Peoples Finance & Thrift Company had it, and he told me about the mortgage. I asked him if it was a chattel mortgage in the regular form and he said it was. I asked him if it provided he could retake possession of the automobile in default of payments and he said it did. I do not just recall any other part of the conversation I had.

"Q. By Mr. Best: Was anything said about being there on the day previous?

"A. Oh yes. He told me he had been there the day before and I went into that thoroughly with him and he said when he went down the day before he stopped at Mr. Casey's and Mr. Casey told him to go and take the ambulance, that it was down at the Contractors General Hospital and to go down and get it if he wanted; that he went down there and saw Doctor Garfield and talked with him and that Doctor Garfield called up his attorney, Mr. Paradise, and that he called up the Peoples Finance & Thrift Company in Riverside and that he left that day but was ordered to go back on the following day to take possession of the car.

"Q. Was anything said about the terms of this rental agreement or lease or anything of that kind?

"A. Not that I recall. As I recall he did not have the rental agreement with him. I don't recall having seen that at that time but he told me that Doctor Garfield had either borrowed or rented the car from Mr. Casey, and I had some discussion with him about the person who had mortgaged the car or given title to it as security for a debt, as to his right to lease it, and I believe I told Mr. Weatherly that the person who had given a contract on the car, the person who rented a car from another party who had a contract on it, that he acquired no greater right than the person who gave it, that had the contract against the car.

"Q. Then was a complaint signed? A. Yes, I suppose there was. There was a complaint in the office given to Mr. Weatherly and he was directed to go to the Justice Court and file it. Q. Did you give Mr. Weatherly any advice in regard to signing the complaint or not? A. Yes, I told Mr. Weatherly there was sufficient evidence to warrant the filing of the criminal complaint charging assault with a deadly weapon, in my opinion."

It thus appears that the story told to the deputy district attorney by J. D. Weatherly differs from the testimony of plaintiff in but three particulars: (1) The revolver was loaded; (2) it was pointed at Weatherly; and, (3) plaintiff threatened to shoot Weatherly.

It should be here noted that at the preliminary examination held on the felony charge, the committing magistrate held plaintiff to answer. This was *prima facie* evidence of the

existence of probable cause. It should also be observed that no one, including plaintiff, knew that the revolver was unloaded, except Dr. Cherry. On May 29, 1935, after the plaintiff had been released on his own recognizance, he, with his attorney, appeared in the office of the district attorney and made a voluntary statement which was taken down in shorthand by a stenographer. In that statement the following appears:

"Q. Weatherly says you came out with a gun in your hand and told him you would shoot him if he touched the ambulance. Do you remember that? A. I might have said it. As a matter of fact, he did touch the ambulance and tied a rope on it and I did not shoot him. . . . Q. Did you point the gun at any of these follows? Weatherly says you pointed it at him and told him you were going to shoot him if he didn't leave it alone. Did you do that? A. I don't particularly recall doing that. I know I had the gun in my hand and I believe I avoided pointing it at him."

The case of *Perry* v. *Washington National Ins. Co.*, 14 Cal. App. (2d) 609 [58 Pac. (2d) 701, 59 Pac. (2d) 158], is persuasive here. There the plaintiff recovered damages for malicious prosecution. The defendants presented their case to a deputy district attorney and were advised to file complaints. The facts they detailed to the official were widely variant from the plaintiff's evidence of the affray which was proven at the trial of the malicious prosecution action and upon which the judgment rested. In reversing the judgment because plaintiff had failed to prove malice and lack of probable cause and because defendants had acted on the advice of counsel, the court said:

"And with regard to the causes of action for malicious prosecution, it is well established, as pointed out in *Haydel* v. *Morton*, 8 Cal. App. (2d) 730 [48 Pac. (2d) 709], and *Richter* v. *Neilson*, 11 Cal. App. (2d) 503 [54 Pac. (2d) 54], that the burden is always upon the plaintiff to establish the concurrence of two indispensable elements, first, that the defendant acted without probable cause, and secondly, that he was actuated by a malicious motive. (*Griswold* v. *Griswold*, 143 Cal. 617 [77 Pac. 672]; *Moore* v. *Durrer*, 127 Cal. App. 759 [16 Pac. (2d) 676]; *Davis* v. *Pacific Tel. & Tel. Co.*, 127 Cal. 312 [57 Pac. 764, 59 Pac. 698]; *Carpenter* v. *Ashley*, 15 Cal. App. 461 [115 Pac. 268].) As shown also

in the Haydel and Richter cases, *supra,* the term 'probable cause' as used and applied in the law of malicious prosecution has been defined to be a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true (*Johnson* v. *Southern Pac. Co.,* 157 Cal. 333 [107 Pac. 611]; *Lee* v. *Levison,* 173 Cal. 166 [159 Pac. 438]; *Selvester* v. *Kennedy,* 137 Cal. App. 250 [30 Pac. (2d) 63], and cases cited therein); and in this connection it has been repeatedly held that the existence of probable cause is not negatived merely by a showing that the accused has been able at the trial of the criminal charge to obtain an acquittal; that such favorable determination does not even create a conflict on the issue of probable cause. (*Haydel* v. *Morton, supra; Dunlap* v. *New Zealand F. & M. I. Co.,* 109 Cal. 365 [42 Pac. 29]; *Moore* v. *Durrer, supra; McKenna* v. *Heinlen,* 128 Cal. 97 [60 Pac. 668].) Furthermore, as indicated, even though a want of probable cause is shown, malice must also be affirmatively established (16 Cal. Jur. 735; 18 R. C. L. 28); and it is held, therefore, that though it be found that the facts upon which the person bases the charges do not in point of law constitute a crime, if they are of such character as to induce in the mind of a reasonable person the honest belief that an offense has been committed and the accuser is not actuated by improper or sinister motives, he shall not be held liable in damages afterwards for having caused the arrest. (Citing cases.)

"Moreover, as stated in the Richter case, *supra,* it has long since been the law that if in addition to his own belief a defendant proves that before commencing the prosecution of the action alleged to be malicious he sought the legal advice of an officer selected by the people to prosecute offenders against laws, and in good faith fully and fairly disclosed to that officer all the information he possessed, and he advises that a crime has been committed and the prosecution is instituted upon a complaint prepared by that officer, the defendant has made out a complete defense to the action (citing cases) however erroneous such advice may have been. (*Potter* v. *Seale,* 8 Cal. 217, 218, 226; 18 R. C. L. 45.)"

The burden of proving malice and want of probable cause rests on plaintiff and may not be lightly avoided. To sustain this burden he must prove that the complaining witness did not have reasonable grounds for believing that the material

facts alleged in the criminal complaints were true. He did not sustain such burden. Plaintiff was excited and angry. He armed himself with a weapon. While so armed and angry he told Weatherly that he had better stay away from the ambulance. We must conclude that plaintiff did not in words threaten to shoot Weatherly nor did he point the revolver at him. If the weapon had been loaded and if plaintiff had been found guilty of the crime of assault with a deadly weapon, the judgment could not have been reversed because of insufficiency of the evidence. The threatening manner of plaintiff, had the revolver been loaded, coupled with his other acts, would have furnished the necessary elements of the crime. It is true that the revolver was not loaded. This fact was known only to Dr. Cherry. Plaintiff did not know that fact until after the altercation. Weatherly at all times stoutly maintained and believed that it was loaded. Ordinarily a man would not arm himself with an unloaded revolver and with it attempt to bluff three men who were his adversaries. The very actions of plaintiff furnished grounds for the belief that the revolver was loaded.

The evidence shows that Weatherly did entertain a "suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true". (*Lee* v. *Levison, supra.*) In other words, there was probable cause for his belief in the truth of the charges. The evidence shows that defendants instituted the prosecution in good faith on advice of counsel.

The judgment is reversed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 18, 1938, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 17, 1938.