[Civ. No. 3936.   Fourth Dist.   Aug. 11, 1949.]

MARTHA SUTHERLAND et al., Appellants, v. LENNERT PALME et al., Respondents.

Pat A. McCormick and Luce, Forward, Lee & Kunzel for Appellants.

Maurice M. Myers, John F. Martin, Edgar B. Hervey and Henry F. Walker for Respondents.

BARNARD, P. J.—This is an appeal from a judgment notwithstanding the verdict in an action for malicious prosecution. About noon on October 4, 1946, Mrs. Sutherland was taken into custody and confined in the psychopathic ward upon an order of detention based upon a petition prepared by Dr. Andrews, the county psychiatrist, and verified by the defendant Palme. The matter was set for hearing on October 10, but she was released about noon on October 6 on the suggestion of Dr. Andrews, with the approval of the judge. On October 10, the proceeding was dismissed without a hearing, and without the knowledge of the respondents.

In this action which followed, the defendants raised issues as to probable cause, malice and favorable termination. At the conclusion of the testimony they moved for a directed verdict in their favor, which was denied. A jury returned a verdict for $12,000 in favor of the plaintiffs. After notice of entry of judgment the defendants filed notice of motion for judgment notwithstanding the verdict, setting forth seven grounds, and reserving the right to apply for a new trial in the event that motion was denied. They also filed notice of intention to move for a new trial on all of the statutory grounds. In granting the motion for judgment notwithstanding the verdict, the judge expressed the opinion that no legal termination of the prior proceeding sufficiently appeared, since the provisions of the Welfare and Institutions Code had not been followed. However, he specifically stated that he was granting the motion upon six of the seven grounds relied on and that "the question of damages has not been considered." A judgment notwithstanding the verdict was entered which recites, among other things, that it was granted upon the grounds: that the motion for a directed verdict should have been granted; that the evidence was insufficient to justify the verdict; that the verdict was contrary to the law and to the evidence; that the preponderance of the evidence was in favor of the defendants; and that they are entitled to judgment as a matter of law. This appeal followed.

The Sutherlands and the Palmes owned adjoining homes at Rancho Santa Fe. The Sutherlands had 18½ acres and the

Palmes 26 acres. Mr. Sutherland was employed as a writer in Hollywood and was usually at home only on week ends. The trouble first started in 1943 when Palme erected a fence about a foot on his side of the line between the two properties. Mrs. Sutherland complained that this fence was unsightly, although from the picture in evidence it appears to be an ordinary woven wire fence with iron posts. She continued to complain, repeatedly, because Mr. Palme kept in his pasture at various times some goats, cows, horses and turkeys. She also complained to the authorities that water overflowed from his septic tank and some of it flowed over on her property, with a bad odor. In July, 1945, the county sanitation officer wrote to Mr. Palme stating that he had received complaints and had investigated, that two places were breeding mosquitos, and that the condition must be corrected within 10 days or legal proceedings would be brought. Mr. Palme testified that he corrected the conditions at considerable expense and no further defect in this regard appears.

There is a great deal of evidence, confirmed in part by her own testimony, that Mrs. Sutherland remained very angry and behaved in an abnormal manner, especially in view of the nature of the things at which she took offense. There is evidence that she repeatedly directed vile and offensive names at the Palmes, in talking to them and to others; that she frequently disturbed them by denunciations and wild talking; that on two occasions she threatened to shoot them; that she knocked the Palmes' small boy off his bicycle; that she frequently left the telephone off the hook, which prevented the Palmes from using the party line; and that she did many other things which could hardly be considered as rational.

On the stand, Mrs. Sutherland admitted that she deeply resented the building of fences and the keeping of animals on the Palme property. As she testified, her own animal husbandry was confined to the keeping of dogs. She admitted that she left her phone off the hook, stating that she did this in order to have it available when she wanted to use it herself; admitted that she drank some, but claimed that this was not to excess; and admitted, as we read the record, that she once knocked the Palme boy off his bicycle. Except for the septic tank matter, she makes no complaint against the Palmes, in her entire testimony, other than with respect to their normal use of their own property. She does not charge that they ever quarreled with her, or retaliated in any manner.

There is ample evidence that Mr. Palme became genuinely alarmed for the safety of his family. In June, 1945, he consulted the local justice of the peace and asked what could be done. The justice told him he could put Mrs. Sutherland under a peace bond but he doubted whether it would do any good, and advised him to see a lawyer. On June 11, 1945, this lawyer wrote a letter to Mrs. Sutherland stating that she had made repeated threats against Mr. Palme, in one instance threatening to shoot him, and that she had otherwise disturbed the peace, including the use of offensive language in the presence of his family and others. The lawyer further stated that he had advised Mr. Palme to have her arrested but that Mr. Palme was unwilling to take such action. The letter went on to express the hope that she would correct the situation, and to state that if this was not done court action would be taken.

A final incident arose over some pigeons which had been acquired by Mr. Palme's son. Mrs. Sutherland testified that she observed these pigeons flying over her property and alighting on her roof; that she got very angry; that she got a stick and yelled at them and they went down in the pasture; and that for about 10 minutes she "tried to chase the pigeons off my property." When asked by her counsel to describe what occurred on this occasion she replied: "Well, I have gone through an awful lot with the Palmes, with the turkeys and the goats and the cows and the bull and the horses; everything else on the place. They were a nuisance. This day I saw the pigeons flying over on my roof, then I just said, 'Well, I am just going to raise the dickens about these pigeons.'"

The defendants' version of this incident is somewhat different. Mr. Palme testified that he was in his office when he heard shouts and screams from the other side of the fence; that he went out and saw Mrs. Sutherland patrolling up and down with a shotgun under her arm, repeatedly shouting that she was going to shoot and that somebody would be sorry; that his wife came out and when she saw the shotgun she rushed in and telephoned to a deputy sheriff. Mrs. Palme testified that she heard Mrs. Sutherland shouting in the loudest and most threatening voice she had ever used; that it "struck terror to her heart" and she felt something was very wrong; that she went outside and saw Mrs. Sutherland walking "by our fence with a shotgun under her arm"; that Mrs. Sutherland repeatedly shouted she was going to shoot and somebody would be sorry; and that she went in and

telephoned to the deputy sheriff. Another witness also testified that he saw the shotgun.

Two deputies sheriff came out and Mr. Palme asked them to go over and take the shotgun away from Mrs. Sutherland. One of them later went over and Mrs. Sutherland told him that although her husband had a shotgun it was in a case, and that she had been armed only with a stick. Palme had a great deal of conversation with the officers who said there was nothing they could do, and also again talked with the justice of the peace. Palme testified that both the officers and the justice advised him to bring an insanity charge, and gave him the name and telephone number of Dr. Andrews of whom he had never before heard. The justice and the officers denied that they had advised such an action. One of the officers testified that Mr. Palme asked them to go to Mrs. Sutherland's house and take the shotgun away from her "because he was afraid for the safety of his wife and children"; that this was all he asked them to do; that he later told Palme that he did not see any gun over there and that Mrs. Sutherland had assured him that she was yelling at the pigeons and had had a stick; that he told Palme he did not think there was anything the officers could do; that Palme protested that something ought to be done and said that Mrs. Sutherland acted like a crazy woman; and that the other officer replied "That is not for the sheriff's department, if that is what you think you had better see Dr. Andrews about it."

Mr. Palme phoned to Dr. Andrews for an appointment and went to see him on October 3. The defendant Bach, who had lived in Mrs. Sutherland's house or a part of it for some months, went with him. Mr. Palme told his story and Bach told the doctor of some peculiar and unusual incidents which had occurred while he lived there. Dr. Andrews condensed the information given him and gave them a short typed statement, which reads: "Without adequate cause, is given to making noisy charges against others—has threatened violence with and without shotgun in hand—a mental examination is now sought." He sent them to a county office where one of his assistants prepared a petition in which this statement was copied as the factual basis for the belief that Mrs. Sutherland was mentally ill and in need of supervision, care or treatment. Mr. Palme signed the petition, an order for detention was issued, and Mrs. Sutherland was taken into custody and kept in the psychopathic ward for two days.

Dr. Andrews testified that Mr. Palme, when he came to him, showed a very definite concern for the safety of his family; that he interviewed Mrs. Sutherland at the psychopathic ward on October 4 and October 5; that the papers were first issued on what Mr. Palme told him "but in her interviews with me she gave me the impression that she engaged in conduct which called for this act on his part. She was very candid—and recognized that she had over-acted. I talked that all over with her. Over-reacted to her grievances"; that the reaction was "way in excess of what the average person would do under the same circumstances"; that this represented an "abnormal reaction to whatever grievance existed"; that he concluded that "she was not sufficiently far out on the line to have suffered a psychosis" but that she "was a psychopathic personality who was apt to do annoying things when she drank," and that this condition would be aggravated if she was left alone a great deal; that because of this he advised Mr. Sutherland to be with his wife as much as possible "to prevent a recurrence of the conduct which she admitted"; that on October 6 he told Mr. Sutherland that his wife had been candid enough to admit that her conduct with reference to some of these complaints had been of a disturbing character; that he advised Mr. Sutherland strongly to safeguard her in the future and to try to not leave her alone so she would be less likely to engage in excited behavior; and that Mr. Sutherland assured him that there would not be a recurrence of the conduct which Mrs. Sutherland had admitted. Dr. Andrews further testified that after two days' examination and observation by the nurses he concluded Mrs. Sutherland knew what she was doing "and was not committable as a mentally ill person, and on account of that fact I advised the court to dismiss the case." After Dr. Andrews so testified the plaintiffs, who had called him as their witness, attempted without success to impeach his testimony.

The appellants first contend that a favorable termination of the insanity proceeding, an essential element of such an action, was sufficiently established here. The respondents contend that the showing was insufficient in that there was no proper legal termination of the prior proceeding. Admittedly, many of the requirements of division VI of the Welfare and Institutions Code were not complied with. It is argued that under these statutes there is no provision for a "dismissal" on the suggestion of a single physician; that the petitioner was entitled to have a hearing on the matter, with notice to

him; that the judge must determine the issue upon the evidence produced at a hearing; and that the petitioner was entitled to a jury trial upon an adverse decision. The hearing provided for by section 5050.9, to be held in the manner thereafter provided, is one to be held at the request of the alleged mentally ill person or one which the judge may order on his own motion. There is no provision that such a hearing must be had unless such a request is made. While there is no provision in these statutes for a dismissal of the proceeding without a formal hearing we think the court has an inherent power, in a proper case, to thus dismiss the proceeding. Such a proceeding is not a prosecution and is one which must largely, if not entirely, rest on technical and expert opinion and advice. When the psychopathic officer, who is charged with the responsibility, is satisfied from his examination of the patient and hospital records that further proceedings would be useless it would be unreasonable to require the judge, in every case, to proceed with a formal hearing. We think these statutes were not intended to have that effect. In any event, the proceeding was actually dismissed, in accordance with long and wide practice, and we think a favorable termination sufficiently appears under the rules set forth in *Jaffe* v. *Stone,* 18 Cal.2d 146 [114 P.2d 335, 135 A.L.R. 775].

It is next contended that malice and want of probable cause were sufficiently established. While there is no direct evidence of malice here, even in the testimony of the appellants, malice may be inferred from want of probable cause. (*Garfield* v. *Peoples Fin. & Thrift Co.,* 24 Cal.App.2d 144 [74 P.2d 1061].) The important question is whether the appellants sustained the burden resting upon them to show that probable cause did not exist. There is ample evidence of probable cause here. That Mrs Sutherland entertained and displayed great animosity toward the Palmes clearly appears, and was admitted by her. The reasons she gave therefor are extremely unsatisfactory. Her own testimony shows that her complaints were violent, long continued and unnatural. The Palmes suffered in silence for several years and were unwilling to take court action when advised to do so by their lawyer. The preponderance of the evidence clearly indicates that Mr. Palme was frightened and desired only to protect his family; that he tried to get help from several peace officers and at first only asked that she be disarmed; that he knew nothing about Dr. Andrews or insanity proceedings; that one or more of the peace officers suggested that he go to Dr. Andrews and

told him where the doctor was to be found; that what he told the doctor was true and was admitted to the doctor to be true by Mrs. Sutherland; that Mr. Palme acted on the suggestion of the officers and on Dr. Andrews' advice; that the doctor concluded after examination that Mrs. Sutherland was abnormal and needed some restraint but that the conditions could be corrected at home; and that he recommended her release on the representations of herself and her husband that these conditions would be corrected.

That Mr. Palme did not act hastily, that he had good reason for believing that Mrs. Sutherland was in an abnormal mental condition, and that he had considerable cause for alarm could hardly be questioned. A layman could not be expected to know her actual mental condition. Mr. Palme could be guided only by her acts and conduct as they would appear to a normal man. He acted with reluctance, on the advice of Dr. Andrews, and probably on that of one or more of the officers. Moreover, there is small wonder that the jury was confused on the real issues as the trial lasted more than a week, and the pertinent evidence was buried in a mass of immaterial and trivial testimony and the innumerable and prolonged arguments of respective counsel.

While the preponderance of the evidence indicates that there was probable cause here it must be admitted that there is some evidence to the contrary. While Mrs. Sutherland admitted some of the matters involved, and her testimony as a whole furnishes considerable support to the conclusion that probable cause existed, she denied that she had made any threats against the Palmes, that she had used any vile language with respect to them, and that she had been armed with a gun. It cannot be said that the evidence in this regard is undisputed; the good faith and belief of the respondents were elements to be considered; and a question of fact remained for the jury. (*Franzen* v. *Shenk,* 192 Cal. 572 [221 P. 932].)

It is well settled that a judgment notwithstanding the verdict may not be entered unless the evidence on material issues is undisputed, or where contrary inferences might be drawn in favor of the other party. While we are forced to conclude that such a judgment should not have been entered here, it seems unlikely that the trial court, having power to weigh the evidence, would allow this verdict to stand. The motion was here made under the alternative procedure provided by section 629 of the Code of Civil Procedure.

While the judgment notwithstanding the verdict must be reversed and a judgment upon the verdict entered, the matter of granting a new trial may then be presented within the required time after notice of the entry of such judgment. (*Lauritsen* v. *Goldsmith*, 99 Cal.App. 671 [279 P. 168]; *Ferran* v. *Mulcrevy*, 9 Cal.App.2d 129 [48 P.2d 948]; *Tomlinson* v. *Kiramidjian*, 133 Cal.App. 418 [24 P.2d 559]; *Parsell* v. *San Diego Consol. Gas & E. Co.*, 41 Cal.App.2d 382 [106 P.2d 935].)

The judgment is reversed with directions to enter judgment upon the verdict.

Mussell, J., concurred.