[Civ. No. 14490. Second Dist., Div. One. Apr. 9, 1945.]

JEAN SINGLETON, Respondent, v. JOHN SINGLETON, Appellant.

682

George Penney and Jean Wunderlich for Appellant.

George Stahlman for Respondent.

WHITE, J.—The plaintiff, Jean Singleton, sued the defendant, John Singleton, who is her brother, for malicious prosecution and, upon trial before the court sitting without a jury, was given judgment for "$2500 as actual damages, $200 for attorney's fees in criminal proceeding, and $2500 as exemplary and punitive damages," from which judgment defendant prosecutes this appeal.

The action arose out of plaintiff's arrest on a grand theft charge filed against her on September 22, 1942, by defendant, after consultation with his own attorney, a police officer and a deputy district attorney, the latter of whom prepared the criminal complaint, which was signed by the defendant, and upon which the warrant for the arrest of plaintiff was issued. Pursuant to the warrant of arrest, plaintiff was taken into custody at the home of her sister in San Fernando Valley, was transported to University Division Police Station in the city of Los Angeles, where she was "booked" on a charge of grand theft, fingerprinted and photographed. After remaining in custody at University Station for some three or four hours, plaintiff was transferred to the Los Angeles County Jail, where she was again "booked," fingerprinted, photographed, and where she remained for some three hours, when she was released on bail. At the conclusion of the preliminary examination subsequently held in the Municipal Court of the City of Los Angeles, the magistrate, upon plaintiff's motion, dismissed the case.

As grounds for reversal, defendant contends that the evidence is legally insufficient to support the findings or judgment; that the evidence shows conclusively, as a matter of law, that defendant had probable cause for signing the criminal complaint, and that in so doing he acted without malice; that the court erred in denying defendant's motion for a nonsuit; that the court erred in denying defendant's motion for a mis-

trial; and that, as a matter of law, the actual and exemplary damages assessed against defendant are excessive and not supported by any evidence in the record.

Viewing the evidence in the light most favorable to the plaintiff, as we are required to do following a judgment in her favor, we thus epitomize the factual background which gave rise to this litigation as revealed by the record.

The parties are sister and brother, defendant being the older by eight years. In 1924, with their parents and an older sister, they moved from Ireland to 851 West 48th Street in Los Angeles, which premises were then purchased by their father and mother as joint tenants. Their father diềd in 1931, and in 1932, their mother, in order to ''save inheritance tax,'' transferred title of the real estate to defendant and herself as joint tenants. Upon her death in 1940, defendant became the record owner of the place. From 1924 until 1942 (a few days before plaintiff's arrest) both plaintiff and defendant lived there.

Besides the family home, there were on said premises several apartments and rooms which were rented. The income from said apartments and rooms was used by the parents to pay the family's living expense and also to make payments on the purchase money mortgage and trust deed. According to plaintiff's testimony, from 1937 on, in lieu of paying board at home, defendant made the payments due on the purchase money mortgage and trust deed.

Said home was furnished originally by their father and mother, in the main with things bought at auctions. Then, after defendant went to work at Barker Bros. furniture store about 1926, in order to obtain the benefit of his discount, plaintiff and her mother from time to time bought items of furniture there on defendant's charge account, sometimes trading in their old pieces, and reimbursed defendant therefor when he paid the bills and brought home the receipts. From time to time, some furniture was purchased by plaintiff and her mother from other stores, also, and placed in the home or in the rented apartments.

Plaintiff left her employment and stayed home to keep house and care for her mother from 1932 to 1935, about a year in 1937 and 1938, and again from 1939 until her mother's death in April, 1940. Their mother was ill during these periods and in 1939 and 1940 she required almost constant nursing care. While plaintiff was staying at home, she also

kept house for her brother, cooked his meals, washed his clothes, made beds, watered the yard, rented the apartments, and collected the rents, out of which, together with her own savings, she paid for groceries for her brother, her mother and herself, medicines for her mother, utilities for the entire premises, and made minor replacements in the rented apartments.

There is positive testimony that, prior to her death, the mother of plaintiff and defendant made a gift to the former of the furniture then in the premises. Equally positive is the testimony that defendant was apprized of such gift and knew that it was their mother's "wish and understanding" that, upon the death of the mother, the furniture would belong to plaintiff. The defendant, testifying in his own behalf, flatly contradicted much of the foregoing testimony. The evidence given by him was that his sister, the plaintiff, never made any claim of ownership of the property allegedly stolen, that each and every item of the personal property in question was bought and paid for by him, and that neither his mother nor plaintiff ever "reimbursed him" or gave him any money on account of the charges they made against his account at Barker Bros. He also testified that, in filing the criminal complaint against his sister, he relied upon his personal attorney's advice and that of the deputy district attorney, after a full disclosure of all the facts as they were known to him.

It was also testified that defendant (about a year before the death of their mother) agreed that, after their mother's death, plaintiff should continue to keep house for him, take care of the rental property, collect the rents, pay for groceries and utilities, and that during their mother's last illness, defendant told plaintiff "the balance, whatever it should be she could spend as she wished." Plaintiff and defendant continued to live there under that arrangement until July, 1942; and on September 12, 1942, plaintiff moved away, taking her clothes and some of her furniture.

From July until September, 1942, there was disagreement and discord between plaintiff and defendant, during which time defendant told plaintiff he would no longer live up to their agreement made before their mother's death; and plaintiff asked defendant to settle her interest in the real property. Defendant told plaintiff she had no interest in the real property; that it belonged solely to him, and advised her to

consult an attorney about it, which she did. Plaintiff's lawyer wrote to defendant asking for a settlement of her said claim. Defendant in plaintiff's absence "plugged" the locks so that she could not enter when she returned home; and plaintiff asked defendant if she could take the things that belonged to her out of the place, and he said no, "just her personal clothing." In order to gain entry to her home and possession of her furniture plaintiff agreed she "would see about" the new terms demanded by defendant; and plaintiff testified that she found that she "couldn't possibly pay $75.00 per month plus the utilities and go to work and keep up that property, physically I wasn't fit for it, so I just simply said I was moving" and "moved out of the apartment before the agreement was final."

On defendant's return home after plaintiff's removal therefrom, he missed certain items of furniture, made a list of them, estimated their value at about $800, telephoned his lawyer and asked what to do. His lawyer told him he would have to report it to the police, but if he would be unwilling to prosecute his sister in case she had taken it he should not report the theft, as the police department could not be used as a collection agency. He phoned the police station and reported the theft. Officer Flannery called at the 48th Street place to investigate; and concerning said call he testified as follows:

"He (defendant) said he had made a burglary report on it, not knowing who took the property. . . . Later on during the conversation he stated that he thought possibly that his sister had taken the property . . . at that time I stated, 'Well, if your sister took the property'—he said at that time it was his property, and I asked him, 'If she had taken the property, would you be willing to prosecute her on grand theft merchandise', and he said he would. I said 'If you are not going to prosecute her, we have no interest in the case,' and he said, 'Yes, I will prosecute her to the utmost of the law.' "!

According to the testimony of this witness, he visited defendant again about two days later and "he (defendant) still insisted on prosecuting his sister." A few days later Officer Flannery phoned defendant, told him his sister had taken the furniture, and arranged to meet him at the district attorney's office. Defendant telephoned his lawyer, who then asked defendant if he owned the furniture, was told that it belonged to defendant, and thereupon advised him to go ahead with

the prosecution. The list of missing articles made by defendant was turned over to Officer Flannery, then to a deputy district attorney, both of whom, according to the testimony of Officer Flannery, were told by defendant that " . . . all the furniture in the house belonged to him (defendant), that the property belonged to him, that he has acquired some of it from his mother after her death, and the balance of it he purchased at Barker Brothers. He said every bit of it was his."

Said list was used on the trial of this action by attorneys for both parties in examining various witnesses.

From the record it appears that said list included a two-piece divan set, round mahogany occasional table, a large stand lamp, a davenport bed, floor heater and electric toaster, all of which, according to plaintiff's testimony, were bought by her with her own money saved from wages made by her when working, and all of which items she admitted moving. There is considerable conflicting testimony respecting cookstoves, from which the trial judge could have found that the three listed by defendant as stolen and, according to plaintiff's testimony, taken by her were purchased by plaintiff on instalment contracts with money saved by her out of the rents collected by her under her agreement with defendant that they should be considered as her salary, trading in as down payments one stove bought by her mother and given to her and one previously bought by plaintiff with her own money saved from her wages. Included in said list were a table and ten pictures brought by their father and mother from Ireland, and rugs, sheets, pillow cases and mattress pads bought by their parents soon after their arrival in Los Angeles. According to plaintiff's testimony, other items listed, to wit: candlesticks, curtains, sofa pillows, desk, embroidered tablecloth and napkins, mantel clock, lamp, mirrors, vacuum cleaner, and bath rug, were bought with money collected as rents by her mother and given to plaintiff. Plaintiff testified that the washing machine and small kitchen radio were bought by defendant and given to plaintiff as presents before their mother's death. From the testimony of the witness Jean Fox, it could have been found by the trial judge that the pillows and blankets listed were removed from said premises by defendant and his wife in the absence of plaintiff. From the entire record, the trial court could have found that certain listed articles, to wit: two davenport beds, two bath rugs, one peach bath

towel set, two salt and pepper jars belonging to the electric stove, pots and pans, studio couch and chair, suitcase last seen in the basement, garment bag, pillows, hanging mirror, and rug, had not been removed from the premises by anyone, but remained there and could have been found by defendant if he had looked for them. There was testimony that an over-stuffed set listed had been at all times in defendant's own apartment and, some months before, had been covered with slip covers, that defendant had never noticed the covers, had first missed the set after plaintiff moved and listed it as stolen; and that other pieces which had been in use in the rented apartments for a long time and which were first missed by defendant after plaintiff moved were also listed as stolen without defendant's looking in the rented apartments for such items.

The trial court could have inferred from plaintiff's testimony that, even though she was the housekeeper, she had never seen on said premises the lace table cloth, damask dinner sets, four dozen men's pure linen handkerchiefs, linen lace scarfs, camel's hair blanket, which she was accused of stealing, that such articles had never been on said premises. The testimony of Mrs. Garner, oldest sister of the parties, was that one of the rugs listed had never been on said premises, that it was bought by her on her brother's account, paid for by her, delivered to her house, and had been there ever since, while the testimony of Mrs. Muir, another sister, was that one of the stoves listed had been bought and paid for by her in the same manner and had never been in the 48th Street place.

That the primary question to be considered in an action for malicious prosecution is the want of probable cause for the prosecution complained of was the holding in *Grant* v. *Moore,* 29 Cal. 644, 648 and *Bealmear* v. *Southern California Edison Co.,* 22 Cal.2d 337, 340 [139 P.2d 20]. Malice may be inferred from the want of probable cause, but want of probable cause may not be implied from the most express malice. The term "probable cause," insofar as it is applicable to the law of malicious prosecution, has been defined to be a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true (*Haydel* v. *Morton,* 8 Cal.App.2d 730 [48 P.2d 709]; *Richter* v. *Neilson,* 11 Cal.App.2d 503 [54 P.2d 54]; *Johnson* v. *South-*

*ern Pacific Co.,* 157 Cal. 333 [107 P. 611]; *Lee* v. *Levison,* 173 Cal. 166 [159 P. 438]; *Selvester* v. *Kennedy,* 137 Cal.App. 250 [30 P.2d 63], and cases therein cited). ▮ It is also the law that the existence of probable cause is not negatived by showing merely that the accused was successful at the trial of the criminal proceeding in obtaining an acquittal. Not even a conflict on the issue of probable cause is created by such favorable termination of the criminal prosecution (*Haydel* v. *Morton, supra; Dunlap* v. *New Zealand F. & M. Ins. Co.,* 109 Cal. 365 [42 P. 29]; *Moore* v. *Durrer,* 127 Cal.App. 759 [16 P.2d 676]; *McKenna* v. *Heinlen,* 128 Cal. 97 [60 P. 668]).

▮ Where there is no dispute as to the existence of the facts relied upon to show probable cause, it is for the trial court to determine as a matter of law whether an inference of the existence of probable cause is warranted by such undisputed facts, but where, as in the instant case, the evidence bearing upon the issue of probable cause is in conflict in essential particulars, it is the province of the jury, or the judge as the trier of facts, to determine whether or not such facts are shown as will warrant or overcome an inference of probable cause (*Franzen* v. *Shenk,* 192 Cal. 572, 578 [221 P. 932]).

▮ On appeal the findings of the trier of facts as to the existence or nonexistence of the facts and circumstances sought to be proved by evidence introduced before him and relied upon by the respective parties to show probable cause, or the absence thereof, will not be disturbed unless it can be held that they are supported by no substantial evidence in the record (*Ball* v. *Rawles,* 93 Cal. 222, 234-235 [28 P. 937, 27 Am. St.Rep. 174]; *Franzen* v. *Shenk, supra,* at page 577). ▮ The burden of proving that there was no probable cause for defendant's prosecution of plaintiff upon which an action for malicious prosecution is based rests upon the plaintiff (*Starkweather* v. *Eddy,* 210 Cal. 483, 487 [292 P. 467]; *Jaffe* v. *Stone,* 18 Cal.2d 146, 159 [114 P.2d 335, 135 A.L.R. 775]).

▮ Appellant asserts that the following facts were proved by uncontroverted testimony and, as a matter of law, constitute probable cause for instituting the prosecution complained of: That all the property listed as stolen was in the house in July; that it had disappeared when defendant returned after his sister's (plaintiff's) moving therefrom in September; that appellant did not consent to its removal; that respondent removed it in the night time—part of it with a truck; that the

property was removed surreptitiously; that defendant did not know who had taken the property until the officer told him; that when first questioned respondent did not admit taking the property; that respondent never made any claim of ownership of said furniture to or before appellant; that the lawyer who asked for settlement of respondent's claim to an interest in the real property did not mention the personal property; and finally, that respondent is bound and must be judged by the appearances she has created.

As hereinbefore narrated, all of these claims of defendant were controverted, except the following: that appellant did not consent to plaintiff's removal of the furniture; that the lawyer who requested settlement of plaintiff's interest in the real property did not mention the furniture; and that plaintiff removed the personal property at night. Of these, the only one which could possibly militate against plaintiff is the fact that she moved the property at night, and the testimony in that regard is that a sister and niece of plaintiff and defendant accompanied plaintiff on two or three trips with loads of her things in an automobile between seven and eleven o'clock on the same evening; that one load was taken in a truck; that plaintiff had old stoves connected in the rented apartments in place of the three stoves removed by her; and that a neighbor told Officer Flannery she heard plaintiff's voice during the moving and knew it was she who took the furniture. From these circumstances, we are of the opinion that the trial court was justified in finding that the property was not "surreptitiously" taken as claimed by defendant, but that the plaintiff chose to move it at night because it was a more convenient time for her, or for her niece, who was employed during the day, to help her. In the recent case of *Graham* v. *Griffin*, 66 Cal.App.2d 116, 120 [151 P.2d 879], the court held against a similar claim made by an appellant in a malicious prosecution action in regard to plaintiffs who, at 2:30 in the morning, rounded up, drove two and a half miles to a neighbor's ranch, and there loaded on a truck a cow and three heifers, which were on a ranch occupied by both plaintiffs and defendants, and which each claimed to own. In that case the court affirmed a judgment for plaintiffs.

There is manifestly a conflict in the evidence relating to the facts from which the existence or want of probable cause for the prosecution of plaintiff upon the charge of grand theft

must be determined. The law concerning the determination of the question of probable cause in an action for malicious prosecution has been stated as follows:

"While it is not necessary to show that the crime has in fact been committed, it is necessary to show, not only that the defendant had reasonable ground to believe, but that he did in fact believe, that the crime had been committed, and that the plaintiff had committed the crime. Although the question of probable cause, as we have seen above, is a question of law, yet the belief of the defendant in a state of facts is itself a fact which it is proper to submit to the jury for its consideration; and whenever the good faith of the defendant, or his knowledge or belief in an existing state of facts, is an element in determining whether there was probable cause, the court should submit that question to the jury, as well as the other facts which, in its opinion, bear upon that issue." (*Ball,* v. *Rawles, supra,* at p. 234.)

■ In view of the evidence in the case at bar, it cannot be said that the implied finding of the trial court that the facts and circumstances surrounding respondent's taking of the personal property here in question were not such as would constitute probable cause for appellant's prosecution was not justified. ■ When a person takes goods which he honestly believes are his own, under a claim of title, he is not guilty of larceny (*People* v. *Devine,* 95 Cal. 227 [30 P. 378]) nor is such person guilty of embezzlement of the property if it is openly and avowedly taken under a claim of title preferred in good faith (Pen. Code, § 511). ■ As hereinbefore shown, there is evidence that appellant knew respondent was claiming the property in question as her own. In fact it was testified that appellant was present when respondent was invested with title to some of the property. If the trial judge believed, as evidently he did, that appellant was in possession of such knowledge, it cannot be successfully maintained that appellant, as a reasonable man, would have been warranted in believing that respondent acted criminally in the taking of said property, and consequently appellant would not have probable cause for instituting the criminal prosecution (*Burke* v. *Watts,* 188 Cal. 118 [204 P. 578] ; Runo v. *Williams,* 162 Cal. 444 [122 P. 1082] ; *Franzen* v. *Shenk, supra; Richter* v. *Neilson, supra*). ■ Since there is evidence in the record which supports the findings of the trial court that appellant

did not himself believe respondent guilty of the felony for which she was prosecuted upon his complaint, all of the other facts and circumstances relied upon by him are insufficient to constitute probable cause. Even though the facts in themselves might be such as ordinarily to create a belief in the mind of a reasonable person that the crime had been committed by plaintiff, yet if, for the reason that the defendant had knowledge of other facts and circumstances which would destroy such belief, and from which it could reasonably be inferred that defendant did not in fact believe that the crime had been committed and that plaintiff had committed the crime, then the defense of probable cause is not available to defendant, because such knowledge negatives the fact that defendant himself actually did believe that a crime was committed by plaintiff. To effectually urge the defense of probable cause it is not only necessary to show that the defendant had reasonable grounds to believe, but that he did in fact believe, that the crime charged had been committed and that plaintiff had committed such crime (*Ball* v. *Rawles, supra,* at p. 228).

 In further support of his claim that there was ample probable cause, defendant argues that he acted on the advice of his counsel and that of the deputy district attorney who issued the complaint. Without doubt, if it can be said that the defendant satisfactorily showed that, prior to the commencement of the criminal prosecution alleged to have been malicious, he was advised by counsel, after a full and fair disclosure of all the facts within his knowledge, that the crime charged had been committed and if it was further shown that he had acted upon that advice in good faith, he would have established a complete defense (16 Cal.Jur. 741). However, in the case at bar, there is evidence which justified the trial court in its finding that defendant knew, or should have known, the ownership of the property alleged to have been stolen was claimed by his sister, plaintiff herein. The evidence was such that the trial court was justified in finding, also, that the defendant knew the ownership of the property was an essential fact in the case; and that he did not tell his own lawyer, the police officer, or the deputy district attorney that his sister made any claim of ownership of the property, and he even assured each of them that the property was his own. True, in appellant's brief it is claimed that the uncontroverted

testimony of appellant's attorney, "He told me the manner in which the purchases of the ranges had been made. I told him that as long as the property was his——," conclusively negatives such finding; but, from the testimony of said attorney as a whole, it appears that appellant in effect told him the stoves were bought by respondent as appellant's agent and with his money and that the stoves and all other items of furniture listed as stolen were his own; and the trial court impliedly found such statement of appellant to be untrue. Anyone relying upon the defense of advice of counsel must show that he fully and fairly stated all the facts within his knowledge bearing upon the transaction and this can only be done by testimony showing what facts were stated by the defendant to the counsel consulted by him. (*Gordon* v. *Mount,* 125 Cal.App. 701, 706 [13 P.2d 932].)

 Furthermore, the deputy district attorney unequivocally testified that at no time did defendant tell him that his sister purchased any of the household goods, received any as a gift, or claimed title to such property. Because of the issue of disputed ownership of the personal property, the question of good faith in the disclosure of conflicting claims was a proper matter for the trial judge to determine. Manifestly, had the court believed and found that the defendant owned the property, no question of good faith could have arisen in regard to the statements made to his personal attorney and the deputy district attorney, but, if defendant was in possession of knowledge that plaintiff was claiming title to the property and, as the court found, failed to disclose that fact, then there could not have been a full and fair disclosure. In the absence of evidence that such information was received by his personal attorney and the deputy district attorney from some other source, defendant was precluded from relying upon the defense of advice of counsel (*Foster* v. *Banks,* 112 Cal.App. 622, 627 [297 P. 106]).

 And in any event, the defense that a criminal prosecution was commenced upon the advice of counsel is unavailing in an action for malicious prosecution if it appears, as the court found in the instant action, that the defendant did not believe that the accused was guilty of the crime charged (*Vann* v. *McCreary,* 77 Cal. 434 [19 P. 826]; *Murphy* v. *Davids,* 181 Cal. 706 [186 P. 143]; *Hudson* v. *Zumwalt,* 64 Cal.App.2d 866 [149 P.2d 457]).

■ The next point urged is that no element of malice was proven. There is substantial evidence showing that, prior to the institution of the criminal action, the parties maintained an unfriendly feeling toward each other; that defendant locked plaintiff out of their dwelling house; and that in speaking to his niece of and concerning the plaintiff the defendant said ''If she does not have the property back by Monday I will have the sheriff after her.'' In a malicious prosecution case the plaintiff is not required in order to recover compensatory damages to show that the prosecution was inspired by personal hostility, a grudge or ill will. What is required is evidence which establishes bad faith, or the absence of an honest and sincere belief that the prosecution was justified by the existent facts and circumstances (*Richter* v. *Nielson, supra,* p. 507). In the case of *Burke* v. *Watts, supra, at* page 126, so often cited, the applicable rule is quoted from *Runo* v. *Williams, supra, page* 450, as follows:

''Malice in fact is really the foundation of the action and is usually the pivotal point upon which the action turns. It is always a fact directly in issue. Its existence may be inferred by the jury from want of probable cause for the prosecution, or from acts or declarations of the defendant expressing or indicating prejudice, ill will, or malicious motive in the matter of the prosecution. The want of probable cause does not raise a legal presumption of malice; the law presumes nothing on that issue any more than it does on any other issue of fact in a civil action. The jury may, however, if they find that there was no probable cause for the prosecution, infer malice therefrom, although malice is not a necessary inference to be deduced therefrom.''

■ Aside from facts testified to bearing upon the existence of malice, the trier of facts was, as we have pointed out, justified in drawing an inference of malice from want of probable cause (*Burke* v. *Watts, supra; McAfee* v. *Los Angeles Gas etc. Corp.,* 215 Cal. 219 [9 P.2d 212]; *White* v. *Brinkman,* 23 Cal.App.2d 307 [73 P.2d 254]; *Portman* v. *Keegan,* 31 Cal.App.2d 30 [87 P.2d 400]; *Garfield* v. *Peoples Finance & Thrift Co.,* 24 Cal.App.2d 144 [74 P.2d 1061]).

■ Defendant contends that his own testimony was uncontroverted to the effect that he did not know any of the items listed as stolen from him had been paid for by plaintiff or the other sisters, or that some of the items had been

given to plaintiff by her mother, or that some of the items had not in fact disappeared from his own premises prior to the time his sister moved away; and that he was not required to investigate the commission of the crime itself any further than he did before making the complaint. He cites as authority on that point the case of *Richter* v. *Neilson, supra,* page 514. The facts of the cited case are not analogous, and the language therein relied upon by defendant is not applicable to the instant case. In the cited case, defendant did go to considerable trouble to ascertain the facts, but, because of misleading statements made to her by plaintiff, who had left the city suddenly, closing his place of business and leaving no forwarding address, and who received and ignored her letter requesting an explanation, plaintiff's investigation, while it did not disclose the true facts, was held to be sufficient. Here, as to the items paid for by others, there is testimony that defendant, himself, accepted the money for them. As to items given plaintiff by her mother, there is testimony showing his knowledge thereof. As to the items not taken by plaintiff, which defendant contends in his brief disappeared at the time she moved her furniture and were of sufficient value to constitute probable cause for his complaint against her for grand theft, it appears that defendant did not investigate at all, and that, in fact, he refrained from looking in the rented apartments, the basement, and even at the slip covered overstuffed furniture and other items in his own living quarters. From the testimony before the court, it could have found that no property belonging to defendant was actually missing from his premises at the time he accused plaintiff of grand theft; and there is no evidence in the record which could excuse appellant for telling Officer Flannery and the deputy district attorney that there was, and signing a complaint against his sister charging theft of property still on his premises.

Appellant further contends the trial court erred in denying appellant's motion for a mistrial because "the record shows conclusively that the trial court prejudged the case and was biased and prejudiced against defendant and his cause." As evidence of the asserted prejudice of the trial judge, appellant calls attention to the following remark:

"I might say, this is a suit for wrongful arrest and malice is alleged and I think great latitude should be extended be-

cause the events of causing this woman to be arrested are important, if there wasn't any reason for it, *it may be severe.*"

The record discloses that this incident occurred when a sister of plaintiff and defendant was asked to state, ". . . any conversation where your sister and you and your brother were present, and your mother was present before her death, in which there was a discussion about the distribution of the personal property, the furniture and furnishings of the house," and appellant objected, giving as his reason "because you are not trying a will contest." Counsel was heard at length, after which the trial judge made the above quoted statement and concluded the same by saying:

"If she wants to show that Mr. Singleton knew about her claims, apparently counsel takes the position that some light may be shed upon the matter as to whether there was knowledge or not. . . . And I don't think the court has the power to foreclose it. Objection overruled." Appellant's contention that this incident indicates the trial judge's prejudice is without merit.

Other remarks of the trial judge relied upon by appellant as showing prejudice are:

"I don't think we can take the time of the court to hear argument for non-suit *when a case is as plain as this one is, a brother has the sister arrested and thrown into jail when she has said it was her property. . . .*

"If there ever was malice—— well, *I will say there is malice shown conclusively, a brother has his sister put in jail because she went out to the house they both occupied and she took property which she testified belonged to her. . . .*

"In this case, probable cause is alleged in the form of allegations that the defendant told the District Attorney certain things, I have heard that evidence, he has been on the stand. He didn't tell the District Attorney, he doesn't claim to have told the District Attorney that his sister claimed ownership of the property, he had her arrested upon his saying to the District Attorney, 'These are all my things, she took them.' If she took property that did not belong to her, she should be held accountable, but if he had told the District Attorney the truth about it, the District Attorney might have acted differently. . . .

"He has testified under 2055 the property is his, and she has testified in her direct examination the property is hers,

and for the purposes of a motion for nonsuit every intent must [be] indulged in favor of the plaintiff who has presented her case and it is up to the defendant to answer that case. Have you finished with your argument?"

These statements were made by the court during the argument and discussion of defendant's motions for nonsuit and for mistrial, which were thereafter denied. We fail to see any prejudicial error in these or other remarks of the trial judge to which appellant refers. The language of the court in the case of *Rosenfield* v. *Vosper*, 45 Cal.App.2d 365 [114 P.2d 29], cited by appellant as authority for reversal of the judgment herein on the ground of the trial judge's prejudice do not aid appellant upon this appeal because the facts of that case are in nowise analogous with the facts found to exist in the instant action.

In *Rosenfield* v. *Vosper, supra,* the trial court had continually urged upon counsel for both parties more speed in presenting the evidence and the advisability of settling the controversy out of court, and, during a discussion in chambers in the presence of defense counsel, said to counsel for plaintiffs who were suing for $18,000, "Tell your clients that in my opinion it would be to their best interests to settle on that basis" (for $7,500).

In the case at bar, the remarks above referred to were, as heretofore indicated, made in open court during the argument of defendant's motion for nonsuit and preceding its denial. ▇ The trial court, for the purpose of ruling on the motion for nonsuit was required to accept as true all evidence favorable to plaintiff's case (*Mastro* v. *Kennedy,* 57 Cal.App.2d 499, 500 [134 P.2d 865]), to interpret all evidence most strongly against defendant, and to disregard contradictory evidence (*Mitchell Camera Corp.* v. *Fox Film Corp.,* 8 Cal.2d 192, 197 [64 P.2d 946] ; *Dempsey* v. *Star House Movers, Inc.,* 2 Cal.App.2d 720, 722 [38 P.2d 825]).

▇ Appellant also assigns as prejudicial error the refusal of the court to declare a mistrial when, on the morning following the denial of his motion for a nonsuit, his counsel renewed the motion for a mistrial and in connection with which the record reveals the following:

"Mr. Penney: Your Honor, in view of what happened yesterday, I now find myself in a position where I have to be a witness in this case, and I feel the court is prejudiced against

me and I desire to renew my motion for a mistrial and I want to be sworn and make certain statements for the record.

"The Court: Your offer is rejected and your motion is denied. Everything was said in the record.

"Mr. Penney: The tone of the court's voice isn't in the record and I desire at this time to make an offer of proof and I would like to be sworn at this time.

"The Court: Your motion has been ruled upon.

"Mr. Penney: Then I want to make an offer of proof.

"The Court: Do you want to make an offer of proof in addition to the motion which is denied?

"Mr. Penney: Yes, in view of the motion being denied, I want to make an offer of proof at this time.

"The Court: Your offer is denied.

"Mr. Penney: In other words, this court rejects my offer of proof?

"The Court: After a ruling on a motion for mistrial has been denied, you want to further present the case for a mistrial and it has been denied.

"Mr. Barnes: If Your Honor please, isn't it the right of counsel, when Your Honor has ruled upon a motion without hearing any argument on the same——

"The Court: I did hear argument—you are misinformed.

"Mr. Barnes: I am merely speaking about what happened today. Your Honor has ruled upon a motion without hearing argument, without any presentation as the basis for a motion for mistrial, and now I believe counsel is right, and not for Your Honor to pass upon that motion again, but for the purpose of the record of counsel to submit an offer of proof, to put into the record, not for Your Honor to rule upon it again, because obviously that would be a useless gesture, because that would be an idle gesture——

"Mr. Stahlman: Your Honor——

"Mr. Penney: I desire to make an offer of proof as to the court's attitude toward me yesterday and I am standing on my rights to make that offer of proof in the record.

"The Court: Very well, you may.

"Mr. Penney: I offer to prove that during my cross-examination of Jean Singleton on the afternoon of October 13th, 1942, the court addressed me upon several occasions in a definite hostile manner and appearing quite irritable on several occasions, the tone of his voice and his hostile attitude was such that I was embarrassed, that my cross-examination was

conducted under mental strain, at the conclusion of the plaintiff's case, I moved for a non-suit on behalf of the defendant which was immediately denied. I respectfully request permission to cite my authorities. Then followed an argument between myself and the court——

"The Court: You are going to cover the point, aren't you——

"Mr. Penney: I am coming to that. During the course of which the court several times raised his voice in anger, his face reddened and his attitude toward me became more and more hostile. Following certain remarks made by the court, which to my mind clearly indicated prejudice, I requested a mistrial which was immediately denied by the court. Following this motion the court appears to be quite calm and while permitting me to cite my authorities, he did so in sarcastic manner. The court merely—I want to show that the court is laughing at this statement.

"The Court: I am smiling at your statement that the court said something in a sarcastic manner, the court wasn't aware of it.

"Mr. Penney: The court merely glanced at the citations and the manner in which he disposed of both the motions was most humiliating to me as an officer of this court. I further state throughout the trial, particularly in addressing the court, I conducted myself with dignity and gave the court no cause for his unjudicial conduct. I feel that my testimony is vital to the defense in this case, and under the authorities of this State it is a complete defense to the plaintiff's action, but I feel that this court is now so prejudiced against me that he cannot weigh my testimony thoroughly, or impartially.

"The Court: Do you want to testify as to that?

"Mr. Penney: Yes, I want to testify as to that.

"The Court: Take the stand. Although the court is willing to accept as your testimony, your statement."

Appellant's counsel was thereupon sworn and gave testimony relevant to the issues before the court, which included appellant's statement to him and his advice to appellant that the latter was entitled to institute criminal proceedings against the plaintiff.

Following further testimony in behalf of the defendant, as well as evidence given in rebuttal and surrebuttal, both counsel rested their case and announced themselves ready for argu-

ment, whereupon the court suggested a waiver of the rule "that a lawyer testifying in a case may not argue." The suggested waiver was agreed to by plaintiff's counsel. During the ensuing argument, defendant's counsel, so far as we can ascertain from the record interrupted and stated "You can't comment on something that isn't in the record. That was an offer of proof and it wasn't evidence. I want the record to show that." The court replied, "The record will show that you took the stand after making the offer of proof, I said 'Take the stand' and you did. You didn't say a word about it after you got up there under oath." Thereupon defendant's counsel said "Let the record show that the court is looking at me with a very belligerent attitude," to which plaintiff's counsel retorted, "Yes, and I want the record to show that the court is smiling too."

At the conclusion of argument by both counsel, the trial judge began a summary of the evidence, during which he referred to various witnesses by name, commented upon their testimony, and, in commenting upon the credibility to which he believed certain witnesses were entitled, he indicated a lack of belief in the verity of defendant's testimony relative to the issues of probable cause and malice.

The case with which we are here concerned was tried before the court without a jury, and the judge, as was said in *Smith* v. *Coleman*, 46 Cal.App.2d 507, 514 [116 P.2d 133], "had the right to announce the mental processes by which he determined the credibility of the witnesses and by which he arrived at his conclusions." We are not prepared to negative appellant's claim that the attitude of the judge toward his counsel was brusque and, we may say, manifested a feeling of considerable displeasure toward appellant's counsel, which does not appear to have been warranted, and of which we do not approve. But the fact that the judge, in the exercise of his rights to determine the facts from the evidence and in passing upon the credibility of witnesses, may have exceeded the bounds of propriety does not entitle appellant to a new trial. (*North* v. *Vinton*, 17 Cal.App.2d 214, 220 [61 P.2d 950]; *Smith* v. *Coleman*, *supra*, at page 514.)

 In urging a reversal, appellant resorts to the oft-repeated argument that "suits for malicious prosecution are not favored by the courts." In the comparatively recent case of *Jaffe* v. *Stone*, *supra*, at page 159, the Supreme Court disposes of that contention in the following language:

"The frequency with which this statement is made in these

cases calls attention to the need of some explanation. Properly applied, it means that public policy is in favor of the apprehension and punishment of criminals, and limits the person complaining of criminal charges by placing upon him the burden of proving the basic elements of the tort. These elements, viewed on the other side, furnish full defenses to the public spirited accuser or prosecutor. But where the difficult burden of proof is met by the plaintiff, recovery is allowed. This being true, we should not be led so astray by the notion of a 'disfavored' action as to defeat the established rights of the plaintiff by indirection. . . . In brief, the public policy involved has properly served, over many years, to crystallize the limitations on the tort, and the defenses available to the defendant. Having served that purpose, *it should not be pressed further to the extreme of practical nullification of the tort and consequent defeat of the other important policy which underlies it of protecting the individual from the damage caused by unjustifiable criminal prosecution. . . .*" (Emphasis added.)

In his claim that the award of $200 for attorney's fees as special damages is without support in the evidence, appellant must be sustained. The record is entirely barren of evidence that respondent paid any attorney's fees in connection with the criminal prosecution instituted against her by appellant, or that she incurred any liability whatever for such fees in any amount by reason of such prosecution. The allowance of attorney's fees was therefore erroneous (*Torney v. Petersen,* 109 Cal.App. 560, 565 [293 P. 653]).

Appellant next urges what he terms "the impropriety" of an award of punitive damages in an action for malicious prosecution. He cites no authority to support his claim in this regard, saying only that his ability to find but one "reported California malicious prosecution case . . . in which punitive damages were awarded . . . is eloquent proof" of such impropriety. Section 3294 of the Civil Code provides:

"In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

A criminal prosecution begun maliciously and without probable cause justifies the imposition of exemplary or puni-

tive damages. (8 Cal.Jur. 874-875; *Russell* v. *Dennison*, 45 Cal. 337.) There was sufficient evidence of malice, oppression and design to injure the plaintiff, and exemplary damages were therefore allowable (*Maher* v. *Wilson*, 139 Cal. 514, 520 [73 P. 418]).

▮ Finally, appellant contends that the judgment is excessive. Relief from allegedly excessive damages is available only when it appears that the damages awarded have. been given under the influence of passion or prejudice (Code Civ. Proc., § 657, subd. 5). As hereinbefore narrated, the evidence shows that respondent was taken into custody at ten o'clock in the morning in San Fernando Valley, transported to University Police Station in Los Angeles, where she was "booked," fingerprinted and photographed for the police records. After some three or four hours. confinement at University Jail she was transferred to the Los Angeles County Jail where she was again "booked," fingerprinted and photographed, and where she was confined for an additional three hours before securing her release on bail. Under such circumstances, the judgment cannot be said to be excessive, or that it was not the result of the fair, unbaised judgment of the trial court. (*Shaffer* v. *Arnaelsteen*, 54 Cal.App. 719 [202 P. 946]; *Phelps* v. *Cogswell*, 70 Cal. 201 [11 P. 628]; *Kinsey* v. *Wallace*, 36 Cal. 462; *Weaver* v. *Page*, 6 Cal. 681; *Torney* v. *Petersen*, *supra*.) In *Green* v. *Stewart*, 106 Cal. App. 518, 531-532 [289 P. 940], the court said:

"It is the province of the jury and then of the trial court upon motion for new trial, to determine and fix the amount of damages awarded a litigant. They have the witnesses before them and can weigh and consider all the circumstances of the case. All presumptions are in favor of the correctness of the judgment, and under the circumstances of this case we cannot hold it excessive."

Also, in *Wilson* v. *Fitch*, 41 Cal. 363, 386, we find the following:

"The Court will not interfere in such cases unless the amount awarded is so grossly excessive as to shock the moral sense, and raise a reasonable presumption that the jury was under the influence of passion or prejudice. In this case, whilst the sum awarded appears to be much larger than the facts demanded, the amount cannot be said to be so grossly excessive as to be reasonably imputed only to passion or prejudice in the jury. In such cases there is no accurate standard by which to compute the injury, and the jury must,

necessarily, be left to the exercise of a wide discretion; to be restricted by the Court only when the sum awarded is so large that the verdict shocks the moral sense, and raises a presumption that it must have proceeded from passion or prejudice.''

For the foregoing reasons the judgment is modified by deducting therefrom the sum of $200 awarded for attorney's fees, and as so modified is affirmed, respondent to recover costs of appeal.

York, P. J., and Doran, J., concurred.