[Civ. No. 24255. Second Dist., Div. Three. Oct. 17, 1960.]

CHRISTINE J. ALBERTSON, Respondent, v. JOSEPH RABOFF, Appellant.

374

Henry C. Rohr for Appellant.

Charles Murstein and Warner & Cowan for Respondent.

FORD, J.—This is an appeal by the defendant from a judgment for damages in an action for malicious prosecution of a civil action. The background of this matter is stated in *Albertson* v. *Raboff*, 46 Cal.2d 375 [295 P.2d 405].[1]

After the Supreme Court had determined that the amended complaint was sufficient to state a cause of action and had remanded the case to the trial court, a second amended complaint was filed. In that complaint, allegations were set forth in harmony with the following statement on page 383 of the opinion of the Supreme Court: ''Since the judgment must be reversed, plaintiff will have an opportunity if she so wishes to

---

[1] The Supreme Court made the following summary at pages 377-378: ''In 1948 defendant brought an action against plaintiff in which he sought a money judgment and either a lien on real property owned by plaintiff or a judgment declaring that her title was obtained from her husband without consideration and in fraud of creditors. Defendant recorded a notice of pendency of this action in the county recorder's office of the county in which the real property is located. After a trial of the action, judgment was entered in favor of plaintiff on defendant's claims of a lien on or an interest in plaintiff's real property. Defendant did not appeal. Plaintiff appealed only from that part of the judgment awarding money to defendant and that part of the judgment was affirmed. (*Raboff* v. *Albertson*, 122 Cal.App.2d 555 [265 P.2d 139].)

''In the present action, plaintiff alleges that defendant knew at the time of filing his complaint in the prior action that he had no right to a lien on or an interest in her real property, that he nevertheless knowingly and maliciously asserted false claims thereto, and that by recording a notice of *lis pendens* he disparaged her title to her damage. The court sustained defendant's objection to the introduction of evidence on the ground that the complaint did not state a cause of action . . . and entered a judgment of dismissal.''

amend her complaint expressly to allege that defendant's purpose in falsely claiming an interest in her property was to enable him improperly to secure the benefits of a *lis pendens* pending his securing of the money judgment.''

Upon the trial of the case on its merits, the findings of fact of the trial court were in part as follows: 1. The prior action was filed on December 29, 1948. In connection therewith and particularly the second cause of action contained in the original complaint (being a cause of action in which it was sought to assert a claim to the property on the theory of a fraudulent conveyance), the defendant in the present action caused a notice of pendency of the prior action to be recorded in the office of the county recorder. 2. In the prior action, the defendant in the present action asserted that Lee Albertson, now deceased (who was the husband of the present plaintiff), conveyed and transferred the title to the real property to the plaintiff in the present case while he was insolvent and ''in defraud of defendant herein and other alleged creditors of Lee Albertson.'' During the pendency of the prior action, the present plaintiff, through her attorney, sent a letter and notice in writing to the present defendant informing him of the actual and true financial status of Lee Albertson at the time of the alleged conveyance and transfer. The present defendant well knew of the fact that his statements as to the transfer and conveyance of the real property were unfounded and untrue, but thereafter and notwithstanding the notice by the present plaintiff's attorney he persisted in filing amended complaints in the prior action, in all of which he continued to assert claims falsely and maliciously in and to the real property. 3. The present defendant well knew that he had no right, title, estate or interest in and to the real property and that the recording of the notice of pendency of the prior action would decrease the value of the real property and render it unmarketable, and that the actions of the present defendant were without any just, probable or reasonable cause and by reason thereof the present plaintiff suffered damages in the sum of $7,500. The conduct of the present defendant was malicious and with the intent and purpose to injure the present plaintiff. 4. The purpose of the present defendant in recording the notice of pendency of the prior action and in falsely asserting and claiming an interest in the real property was to enable and permit the present defendant improperly to secure the payment of money claimed by him pending his securing a money judgment in the prior action and thereby to

obtain the benefit of an attachment upon the present plaintiff's real property without incurring the burdens of an attachment. 5. The present defendant did not make a full and fair statement or disclosure to his attorneys of the facts constituting his cause of action against the present plaintiff when he instituted the prior action and he did not act in good faith. The defendant in the present action acted with malice in the filing and prosecution of the second, third, fourth and fifth causes of action as set forth in the original complaint and the various amended complaints filed in the prior action.

The defendant, as appellant herein, contends that the evidence fails to support the determination of the trial court. In evaluating such contention, it is necessary to relate the evidence in some detail.

It was stipulated that the appellant herein would testify that he signed the verification of the original complaint and of each amended complaint thereafter filed. The appellant testified that he did not read the original complaint before he signed it, although he believed that Mr. Hutchinson told him to do so and he may have read the paragraph in which the insolvency of Mr. Albertson was alleged. He told his attorney, Mr. Hutchinson, that in May and June, 1946,[2] Mr. Albertson owed a great deal of money and that Mr. Albertson had said that he owed money to the Internal Revenue Department, to his former wife, and for dental work and various bills. Mr. Albertson also told the witness that he owed some department store bills in Toledo. But Mr. Albertson never told him, and the witness did not know, how much he owed on any of those bills. He did not recall telling Mr. Hutchinson anything else with regard to such obligations before he signed the complaint. But he did tell Mr. Hutchinson that Albertson owed him $6,500. His former wife claimed $1,800 ''or some sort of sum of that character.'' He told Mr. Hutchinson that that was a claim in Mr. Albertson's estate, Mr. Albertson having died in September of 1947, but he did not tell Mr. Hutchinson that the debt, which was the basis of the claim made by the former wife, was due in May or June, 1946. When the appellant lent Albertson the money in May, 1946 ($7,500 as part of the money to be used by Albertson to purchase the real property), Mr. Albertson expected to receive severance pay from his former employer but the appellant did not know the amount.

[2] In the original complaint, it was alleged that on or about June 8, 1946, the Albertsons transferred title to the property to themselves as joint tenants and continued to so hold the property until Mr. Albertson's death.

In June of 1946, he did not know of any actions for money filed against Albertson. In May or June of 1946 he did not know of any debts of Albertson except that he may have told him of his income tax problem at that time. In May, 1946, he helped Albertson to borrow $5,000 from a bank and was a cosigner on the note. He did not think the $5,000 was used for any purpose other than the purchase of the property and he did not know that the $7,500 he lent to Albertson was used for any other purpose. In May and June of 1946, Albertson was receiving a salary of $1,250 per month and this amount was paid until Albertson died "and beyond." Under the arrangement, Mr. Albertson was also to receive 10 per cent of the net profits. In May and June, 1946, Mr. Albertson had $5,000 worth of stock in the appellant's company and had some (life) insurance, the cash value of which was unknown to the appellant. He did not think he told Mr. Hutchinson about the insurance. He did not know how much cash Mr. Albertson had in the bank in May and June, 1946, and did not have such information at the time he signed the complaint. He did not recall whether he informed Mr. Hutchinson of his lack of such information. Mr. Hutchinson did not tell him of any unpaid bills of Mr. Albertson that were "due and accrued" in May or June, 1946. At the time he signed the complaint, he understood that the Albertsons had an equity in the property and he told Mr. Hutchinson that they had "approximately $5,000 worth of equity in the property" which represented their own money. The loan as to which the appellant was a cosigner was an installment loan and the appellant never paid any of the installments and he never heard of any defaults. He never gave Mr. Hutchinson "any figure as to the total amount of debts owed by Mr. Albertson and the total amount of assets he had in May and June of 1946" and Mr. Hutchinson never gave him any such figure before the appellant signed the complaint. Before he signed the complaint, he told Mr. Hutchinson that he did not know how much Mr. Albertson owed and what his assets were in May and June of 1946. Mr. Hutchinson never asked him how he knew that Mr. Albertson was insolvent. The appellant knew that solvency depended on the ratio of assets to liabilities but at the time he signed the complaint he did not know that ratio with respect to Mr. Albertson as of May or June, 1946. The creditor's claim filed by the appellant showed that $2,000 had been repaid on the loan of $7,500 but that on December 27, 1946, the appellant had made a loan of $1,000 to Albertson. At the time of the

$7,500 loan, Mr. Albertson told the appellant that he intended to repay it out of the severance pay he was to receive from his former employer.

The statement of assets and liabilities of the new enterprise (of appellant and Lee Albertson), Lee Products, Inc., as of December 31, 1946, showed capital stock of $110,000 and a surplus of $14,928.13. The appellant stated that he believed that was a true reflection of the business as of that date. He told Mr. Hutchinson that the corporation was operating at a profit for 1946. He believed that he told him that the stock owned by Mr. Albertson was worth its par value at least.

The respondent, Mrs. Albertson, testified that in May or June, 1946, Mr. Albertson had $10,000 coming from his former employer and he subsequently received that amount. (Later evidence indicated that the amount may have been approximately $8,000.) She testified that he had life insurance in the amount of $60,000, which had a cash value of $10,000 to $12,000, with loans against each policy of about $200 or $250. When they came to California in the spring of 1946, they owed about $92 to a department store in Toledo, Ohio, which was not yet due. It was paid. As to the subject of unpaid bills in May or June of 1946, her husband did not owe anything and was never in arrears on his alimony payments to his former wife. In May or June, 1946, or thereafter until Mr. Albertson's death, no suits were filed against either of them on account of debts. In April, 1946, he received pension funds in the total amount of $1,740.78. He had advanced between $3,500 and $4,500 in making purchases on behalf of the business he was entering with the appellant and, as far as the witness knew, such advances had been repaid to him. They had government bonds having a cash value of about $4,500 which were sold when her husband and the appellant decided to go into business together. The respondent, Mrs. Albertson, was vice president of the new company and received a salary of $250 a month, including the months of May and June, 1946. In the period of May to August, 1946, Mr. Albertson had no medical bills.

The respondent's efforts to sell the house were unsuccessful because of the *lis pendens*. The same was true of her attempts to refinance the property. After a writ of execution was issued on the judgment,[3] she sold the house in 1952 for $24,000. In

---

[3]The plaintiff recovered a money judgment in the prior case but such recovery was based on the sixth cause of action of the sixth amended complaint. As has been noted in footnote 1, that judgment was affirmed on appeal. (*Raboff* v. *Albertson*, 122 Cal.App.2d 555 [265 P.2d 139].)

her opinion, the value of the property was $31,500. But, in view of the writ of execution, she had to sell it at any price so that she could get what she could out of it. In the intervening period after the prior action was filed, she had desired to sell the property.

A copy of the creditor's claim of the former wife of Mr. Albertson, which was filed in the probate proceeding, was received in evidence. Item 3 thereof was for reimbursement of the college expense of Lee Albertson, Jr., for September, 1946 to September, 1947. The respondent testified that in May or June, 1946, Mr. Albertson did not owe his former wife any sums for college expenses of his son. Another item of that claim related to the reimbursement of federal income tax "for 1947." The respondent testified that as of May or June, 1946, she knew of no amount owed by her late husband for income tax payable by his former wife. A third item of the former wife's claim related to dental expense but the witness did not know when such services were rendered.

The claim of Otto H. Mayer in the Albertson estate was for a loan of $5,000 made by a check which was dated April 26, 1946. The claim was rejected after Mayer indicated he did not intend to press it.

The dental services of Dr. Swan were rendered to Mr. Albertson in the period shortly before the death of Mr. Albertson.

Sarah R. Lorraine, a real estate broker, testified that she sold the property about August, 1952. It was "distressed" property and sold for $24,000.

Paul R. Hutchinson, the attorney who represented the appellant herein as plaintiff in the prior action, was called as a witness on behalf of the appellant. He testified in part as follows: "Now, the things that he told me . . . over a period of the next few weeks or months, while the pleadings were being prepared in this case, in addition to what I have already told you, was the fact that Albertson owed quite a bit of money at the time of this transaction pertaining to his house. . . . I had him name all the creditors that he could name; and he named to me certain creditors. . . . And in addition to that, I checked the files for him, in court, on the estate to see what claims had been filed against Albertson. And then he also discussed with me Mr. Albertson's relations with his former wife and children, as to which he said that Albertson had on a number of occasions told him that he was in default on his payments to Beverly, his former wife, in support of his

children." At the time the complaint was filed, Mr. Hutchinson caused to be recorded a *lis pendens.* He thought he had the duty to do so. From the beginning, in his conferences with the appellant it was stated that the title to the property had been taken in joint tenancy between Mr. and Mrs. Albertson. He determined by his own investigation, prior to the filing of the original complaint, that title had been so taken pursuant to their escrow instructions. Mr. Hutchinson further testified as follows: "Q. . . . The second Cause of Action in the complaint, you will note that it refers to a cause of action based upon allegations to set aside a conveyance in defraud of creditors. . . . When you dictated the allegations of that complaint, that is, that particular cause of action, Mr. Hutchinson, what facts did you know of that related to that cause of action? . . . A. Well, I knew that Lee Albertson had received $28,500.00 in money; and that this had been transferred into a piece of real property in the name of himself and his wife as joint tenants. . . . I knew that he owed the full amount of the $28,500.00 immediately upon acquiring it, that is to say, the asset thereupon immediately equalled the liability. I knew that he owed an Otto Mayer the sum of $5,000.00. I knew that he owed Beverly Albertson, his first wife, a sum of money; he owed a Dr. Swan about $700; and he owed the United States Government on taxes a sum of money; and that I knew that he had no assets whatsoever except the five thousand dollar interest in Lee Products corporation." He further testified that he made a determination as to the value of the Lee Products stock. In that connection, he asked the appellant what capital had gone into it. He further said: "And I asked him what the stock recordings were, which he told me: that two of them owned all of the stock; Albertson only owned stock to the value, as I recall it, original cost of $5,000.00; that their operations were new, and their expenses had been heavy. . . ." As to the value of the Lee Products stock after the death of Mr. Albertson, he formed the opinion that the stock "had no cash value nor salable value." Upon filing the original complaint, the appellant told him that there was no market for the stock and that "their assets, in the main, were frozen in inventory." He believed that the appellant told him that, in his opinion, the stock had no market value. In response to the question as to whether the allegations in the second cause of action of the original complaint were in accordance with the facts which he had testified that the appellant had given him, Mr. Hutchinson stated: "Well, I can't answer that 'Yes' or 'No,' coun-

sel. I will answer it this way: They are, with these two exceptions: Number 1. I obtained certain information by investigation made by me of the files and records of the case and from Mr. Bridges' files, which I testified to. This is in addition to what Mr. Raboff told me. The second thing is that Mr. Raboff only gave me certain facts, as you state. I attempted to convert those facts into ultimate facts in the lawyer's language. For instance, Raboff never told me that this man was insolvent. He told me what he owed and what he had; and I concluded he was insolvent, as a lawyer under my understanding of the Fraudulent Conveyance Act." The appellant never attempted to advise Mr. Hutchinson on the theory of law that he should adopt in connection with the case. On May 10, 1949 (after the action had been filed), he learned from the appellant that at the time the house was bought the Albertsons had put in $3,500 of their own money; that $5,000 had been advanced by a bank; that the first mortgage was for $12,500, and that the appellant's loan was for $7,500, making the total consideration of $28,500 for the house. On January 27, 1949, he learned from the appellant that he had bought Mrs. Albertson's stock for $2,500 and had bought Mr. Albertson's stock from the estate for $2,500. He further testified: "I advised him that, in my opinion, Lee Albertson was insolvent at the time he placed the title of that property in the name of himself and his wife, under the California Fraudulent Conveyances Act; and that, in my opinion, there was a chance that if the Court felt that the title had been placed in the name of his wife and himself while insolvent and he placed half of it beyond the reach of his creditors, that under the Fraudulent Conveyances Act it could be deemed fraudulent as a matter of law irrespective of his motives; and that it was determined by law that a man who transferred an asset while insolvent had violated, though unwittingly, the Fraudulent Conveyances Act." And again: "I told him that each of these causes of action were very tenuous, but that they were theories of the case and that I had tried to set forth every theory on which I thought he might prevail and that I had done the best I could; and that if he couldn't make any of those stand up, I was afraid he had just waited too long to bring his suit and he would be out of luck."

On cross-examination, Mr. Hutchinson said that prior to the time the first complaint was drawn or verified, the appellant did not tell him that Mr. Albertson was insolvent at the time the property was acquired but he did tell him who

his creditors were to the best of his knowledge. When asked as to the creditors which were named, the witness testified: "Q. . . . In connection with this allegation before it was drawn or verified, did Mr. Raboff tell you that Mr. Albertson was insolvent at the time the property was acquired? A. No. He told me what his creditors were, to the best of his knowledge. Q. What creditors did he tell you he had at the time of June 8, 1946? A. Well, I mentioned it before. Q. What were they? A. Beverly Albertson, his wife, for support of the children born of that marriage. He had Otto Mayer, from whom he had borrowed $5,000.00. He had a Dr. Swan to whom he owed several hundred dollars. He owed the Collector of Internal Revenue some money. He owed $28,500.00 to the two banks and to Raboff in connection with the purchase of his home. Q. Did he tell you that? Did Raboff tell you that at the time the property was acquired, Mr. Albertson owed $28,500.00 on the house? A. No. He borrowed all of the money but thirty-five hundred; so that would be twenty-five thousand. Q. So he told you he borrowed twenty-five thousand, did he not? A. I don't know, counsel, whether he told me or whether I ascertained it, but I ascertained it. And I gave you the names of the mortgagees and the amount of the loans." With respect to Dr. Swan's account, the witness got the information from the files of the estate. Before the first complaint was filed, the appellant did not state any specific sums as being owed to Mr. Albertson's first wife. The witness did not think that the appellant told him "in so many words" that, with regard to the value of the stock in May or June of 1946, the business made $14,928.13 in profits, over and above salaries, in 1946. He did not tell Mr. Hutchinson that at the end of the first eight months' operation there was a surplus of approximately $14,928.13. Nor did he say that Albertson's stock was valueless. Before the original complaint was filed, the witness "figured he [Albertson] was insolvent." The only assets which the witness knew he had as against his liabilities were his house and the stock in Lee Products, Inc. The appellant told him that Mr. Albertson had said that he had borrowed on his insurance policies to the extent that they had no cash-surrender value or further loan value.

On redirect examination, Mr. Hutchinson stated, as to the basis for allegations in the original complaint, as follows: "The facts on which I based it was the fact that in buying this property they had put the twenty-eight thousand five hundred into escrow and had transferred that asset into a

piece of real property in the names of the two of them as joint tenants. And I contended that this constituted a transfer of property, to wit, from cash to real property. This was a legal theory which, if upheld by the Court, would, in my opinion,— and I so advised him—constitute a violation of the Fraudulent Conveyances Act. Q. Were these facts that you have referred to—what was the source of those facts, how did you obtain them, from whom? A. Mr. Raboff told me about the escrow, where the property was purchased, and he told me about how the title to the property was taken. I can't tell you the time, but everything about it I had at one time or another. I had the escrow instructions; I had the title search. . . . A. I had his statement, financial statement, and file in the escrow which, as I recall it, showed no assets. I had his own statement made to Mr. Raboff, as related to me by Mr. Raboff, that he had nothing but the equity in a car and life insurance, which was borrowed up to the extent of its full value, and stock in the Lee Products company. Of course, he had the home, but every dime of the cost except the thirty-five hundred had been borrowed. . . . A. Well, I was told by Mr. Raboff that he was unable to pay certain of his obligations as they accrued. I was told by Mr. Raboff that when he arrived here to come into the company, he said that $5,000.00 was all he could raise instead of fifteen thousand, which he had promised to put into the deal. I was told by Mr. Raboff that Mr. Albertson frequently told him that he was unable to keep up his payments to his former wife in support of his children. I was told by Mr. Raboff that Mr. Albertson had said to him that he was behind in the payment of his taxes with the Bureau of Internal Revenue. I was told by Mr. Raboff that Mr. Albertson had said that he had had to borrow on his insurance to the extent of the full value of it. I was told by Mr. Raboff that Mr. Albertson had borrowed $5,000.00 from Otto Mayer to go into this deal. I was told by Mr. Raboff that he owed other creditors. I was also told what his income was and I was told of certain expenses that he had."

The appellant testified that Mr. Albertson was to buy $15,000 worth of stock in the new corporation but later Mr. Albertson said that he only had the money to purchase $5,000 worth of stock. He also related his conversations with Mr. and Mrs. Albertson with respect to buying the house. He told them that while he did not think that the house was "exactly" worth $28,500, "if that is the best they can do, and they liked it, well, they should go ahead with the deal."

In his conferences with Mr. Hutchinson prior to the filing of the original complaint, reference was made to debts of Mr. Albertson. Mr. Hutchinson wanted to know what the financial condition of Mr. Albertson was and the appellant tried to relate it to him. The appellant testified that: "I said, see, that Mr. Albertson owed—Mr. Albertson told me that he owed a great deal of money: he borrowed money in Toledo, he owed Mrs. Beverly Albertson, his first wife, money for alimony, tuition for the children, dentist bills, and other matters. I told him that he owed money on his life insurance, which he told me that he had borrowed on, namely, Mr. Albertson. I told him that Mr. Albertson told me that he borrowed money on his income tax. Q. Mr. Raboff, you just made a statement that 'he borrowed money on his income tax.' Is that what you intended to say? A. No, borrowed money on his insurance policies. And he owed money on his income tax. Q. As to these matters that you have just referred to, did you have a conversation at any time with Mr. Albertson in which he made any mention about his debts? A. Yes. Q. When did the conversation take place? A. This took place when he first came to California." Mr. Albertson had informed the appellant before the purchase of the house as follows: "He said that he owed money to his wife Beverly and she was constantly asking him for it. He also told me that he was being bothered by his wife Beverly for tuition for the children's education, their dentist bills, their medical bills, and other bills that he may have been responsible for. He told me that he owed money on his income tax. He told me that he owed money to other people around Toledo. He told me he owed bills for merchandise, that he owed." The appellant did not know what a *lis pendens* was at the time the lawsuit was filed. He had never before been involved in a lawsuit. He relied on Mr. Hutchinson's advice "one hundred percent." He did not instruct Mr. Hutchinson to file the *lis pendens*.

Pleadings in the prior action were received in evidence by reference. In the second cause of action of the second amended complaint, it was alleged that at the time title to the property was "transferred to and taken in the name of the said Lee Albertson and his said wife," Lee Albertson was indebted to various creditors, the names of whom and the amounts of their claims "are at this time unknown to plaintiff but are well known to defendants." In the second cause of action of the third amended complaint, it was alleged upon

information and belief that some of the creditors and the amounts due to them were: Otto H. Mayer, $5,000; Beverly Albertson, amount unknown; Collector of Internal Revenue, $2,000; Security-First National Bank, $5,000. It was further alleged that the plaintiff did not know "all of the property owned or what property was owned by Lee Albertson during the time said creditors' claims were due, owing, and unpaid and on and about June 8, 1946." In the second cause of action of the fourth amended complaint, it was alleged that the amount of $985.16 for the education of Lee Albertson, Jr., and the amount of $452 for income tax of the former wife were due, "according to plaintiff's best information and belief, on May 11, 1946."

Since the appellant makes no contentions with respect to the evidence as to damages, it is not necessary to give attention to that subject.

In comment g to section 675 of the Restatement of Torts, it is said: "The advice of counsel gives to one who initiates civil proceedings a protection similar to that which it gives to a private prosecutor of criminal proceedings. There is, however, this difference between the two situations. Where the proceedings are criminal, the advice which usually affords protection is that the facts known or reasonably believed by the prosecutor constitute the crime charged . . . . Where the proceedings are civil the advice of counsel is a protection even though it consists merely of an opinion that the facts so known or believed afford a chance, whether great or small, that the claim asserted in the civil proceedings may be upheld."

 That statement is in harmony with the law of this state as expressed by Mr. Justice White in *Murdock* v. *Gerth,* 65 Cal.App.2d 170, at pages 178 and 179 [150 P.2d 489]: "'Probable cause' for the institution of an action does not mean 'legal cause' therefor, because, if it did, every plaintiff who failed to recover in his lawsuit would be liable to an action for malicious prosecution. . . . [██ If the issue which the attorney is called upon to decide is fairly debatable, then under his oath of office, he is not only authorized but obligated to present and urge his client's claim upon the court." (See also *Lotts* v. *Whitworth,* 76 Cal.App.2d 601, 605 [173 P.2d 823]; *Silver* v. *Shemanski,* 89 Cal.App.2d 520, 546 [201 P.2d 418].)

Reliance on advice of counsel in good faith is a defense to an action for malicious prosecution, inasmuch as such defense shows probable cause. (*Schubkegel* v. *Gordino,* 56 Cal.App.

2d 667, 672 [133 P.2d 475]; *Montz* v. *Nevins,* 40 Cal.App. 202, 207 [180 P. 537].) But in order to avail himself of such defense he must have disclosed to his attorney all of the pertinent facts within his knowledge. (*Schubkegel* v. *Gordino, supra,* at page 673.) ▆ As this court said in *Masterson* v. *Pig 'N Whistle Corp.,* 161 Cal.App.2d 323, at page 339 [326 P.2d 918] : "Reliance upon the advice of counsel, provided it is given in good faith and is based upon a full and fair statement of the facts by the client, may afford the latter a complete defense to an action for malicious prosecution. (32 Cal.Jur.2d 74.) But it is an affirmative defense. It may be shown under a general denial in the answer (*Walker* v. *Jensen,* 95 Cal.App.2d 269, 275 [212 P.2d 569], and cases cited), but the burden of establishing it is upon the defendant. (*Diggs* v. *Arnold Bros., Inc.,* 132 Cal.App. 518, 523 [23 P.2d 71].)"

▆ Where the evidence is in conflict or subject to different inferences as to whether there was a full, fair and complete disclosure to the attorney of all of the facts of the case within the knowledge of the client or as to whether the client acted in good faith on the advice of the attorney, it is for the trier of fact to resolve such conflict or draw the credible inferences. (*Seabridge* v. *McAdam,* 108 Cal. 345, 349-350 [41 P. 409]; *Portman* v. *Keegan,* 31 Cal.App.2d 30, 36 [87 P.2d 400]; *Torney* v. *Petersen,* 109 Cal.App. 560, 565 [293 P. 653].) ▆ On appeal, the findings of the trier of fact as to such matters will not be disturbed unless it can be held that they are not supported by substantial evidence in the record. (*Singleton* v. *Singleton,* 68 Cal.App.2d 681, 691 [157 P.2d 886].)

▆ The function of this court as to factual matters is aptly stated in *New* v. *New,* 148 Cal.App.2d 372, at page 383 [306 P.2d 987] : "The appellate court must accept as established all facts and all inferences favorable to respondent which find substantial support in the evidence. ▆ 'And where appellant urges the insufficiency of the evidence to sustain the findings . . . the rule is that, "Such contention *requires defendants to demonstrate* that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550].) (Emphasis added.) ▆ It is said in *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183], that: "It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate

court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ▮ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deduction for those of the trial court.'' ' (*Hartzell* v. *Myall,* 115 Cal.App.2d 670, 673 [252 P.2d 676].)' ''

▮ In the present case, the trial court found that the appellant did not make a full and fair statement to his attorney of the facts constituting his claim against the respondent and that he did not act in good faith. There is substantial support in the record for such findings. It was a reasonable inference from the record that the appellant gave a distorted picture to his attorney as to the extent of the indebtedness of Mr. Albertson at the time of the real estate transaction. It was within the province of the trier of fact to draw the inference that the appellant had no basis for asserting that at that time Mr. Albertson was delinquent in his obligations to his former wife and that he then had an existing obligation with respect to federal income tax. Moreover, the court was justified in drawing the inference that the appellant had misrepresented as to the extent of the loans outstanding against Mr. Albertson's life insurance policies. It was a fair inference that the appellant's representations were colored by the claims asserted during the course of the probate of Mr. Albertson's estate without proper discrimination on the appellant's part as to when the obligations upon which such claims were based came into existence. In the absence of a proper disclosure to his attorney, advice of counsel could furnish no protection to the appellant. (*Fry* v. *Bank of America,* 142 Cal.App.2d 150, 158 [298 P.2d 34] ; *Graham* v. *Griffin,* 66 Cal.App.2d 116, 122 [151 P.2d 879] ; *Schubkegel* v. *Gordino, supra,* 56 Cal.App.2d 667, 672-673.)

As set forth above, the appellant testified to his concept of insolvency which was in substantial harmony with that recognized by the law: ''A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.'' (23 Cal.Jur.2d, Fraudulent Conveyances and Transfers, § 49; Civ. Code, § 3439.02, subd. (a).) He admitted that he did not know the actual extent of Albertson's assets and liabilities as of the time in question. It was his duty to read the original complaint before verifying that pleading by his affidavit. (See Code Civ.

Proc., § 446.) It is a fair inference that he was well aware that he had no factual basis for the assertion that ''[a]t the time title to said property was transferred to and taken in the name of the defendant along with said Lee Albertson . . . the said Lee Albertson was insolvent.'' ''A verification is an affidavit of the truth of the matters stated. (Code Civ. Proc., §§ 446, 2009; Pol. Code, § 4076; *McCaffey C. Co.* v. *Bank of America,* 109 Cal.App. 415, 420 [294 P. 45]; *Pasqualetti* v. *Hilson,* 43 Cal.App. 718, 720 [185 P. 693].) Its object is to insure good faith in the averments or statements of a party. (*Patterson* v. *Ely,* 19 Cal. 28, 39; *Bittleson Law etc. Agency* v. *Howard,* 172 Cal. 357, 360 [156 P. 515].)'' (*Osborn* v. *City of Whittier,* 103 Cal.App.2d 609, 619 [230 P.2d 132].) Moreover, there is nothing in the record to show that the appellant attempted to ascertain, before he verified that complaint, whether his attorney had proof of such assertion over and above appellant's own information. (*Cf. Baker* v. *Gawthorne,* 82 Cal.App.2d 496, 501 [186 P.2d 981].)

It is true, as stated in comment d to section 675 of the Restatement of Torts, that ''where the proceedings are civil, it is enough that the person initiating them believes that he can establish the existence of such facts to the satisfaction of the court and jury.'' As expressed in *Metzenbaum* v. *Metzenbaum,* 121 Cal.App.2d 64, at page 68 [262 P.2d 596] : '' '. . . want of probable cause in a civil proceeding exists when the circumstances are such as to satisfy a reasonable and prudent man that he had no ground for suing.' '' Under the facts of the present case, the trial court was justified in determining that the appellant acted without probable cause in alleging facts directed to the purpose of showing a fraudulent conveyance. The evidence supported the inference that he was attempting to collect the sum of $6,500 from Mrs. Albertson by any means he could and that his purpose in availing himself of such allegations as would support a claim to or against the real property was to obtain ''the benefit of an attachment upon plaintiff's real property without incurring the burdens of an attachment.'' On the prior appeal in this case, the Supreme Court stated: ''The malice required in an action for malicious prosecution is not limited to actual hostility or ill will toward plaintiff but exists when the proceedings are instituted primarily for an improper purpose.'' (*Albertson* v. *Raboff, supra,* 46 Cal.2d 375, 383.) In *Centers* v. *Dollar Markets,* 99 Cal.App.2d 534, it was said at pages 541-

542 [222 P.2d 136] : "In an action for malicious prosecution, malice means actuated by a wrongful motive, i.e., the party must have had in mind some evil or sinister purpose. (*Pickering* v. *Havens,* 70 Cal.App. 381, 388 [233 P. 346].) . . . It does not necessarily infer the presence of anger or vindictiveness. It is sufficient if it appear that the former suit was commenced in bad faith to vex, annoy or wrong the adverse party. (*Hudson* v. *Zumwalt,* 64 Cal.App.2d 866, 872 [149 P.2d 457].) The plaintiff is not required to prove that the prosecutor was inspired by personal hostility, a grudge, or ill-will. (*Singleton* v. *Singleton,* 68 Cal.App.2d 681, 696 [157 P.2d 886].) . . . Like any other fact in issue, malice may be proved by direct evidence or may be inferred from all the circumstances in the case. It may, but need not necessarily, be inferred from want of probable cause. . . ."

The findings of fact of the trial court are supported by substantial evidence. The determination of the trial court is consistent with the applicable law as stated by the Supreme Court, upon the prior appeal, in *Albertson* v. *Raboff, supra,* 46 Cal.2d 375.

The judgment is affirmed.

Shinn, P. J., concurred. Vallée, J., did not participate.

A petition for a rehearing was denied November 14, 1960, and appellant's petition for a hearing by the Supreme Court was denied December 14, 1960. Schauer, J., and Peters, J., were of the opinion that the petition should be granted.